IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FRIENDS OF LYDIA ANN CHANNEL, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| U.S. ARMY CORPS OF ENGINEERS, and | § § § § | |
| LT. GEN. THOMAS P. BOSTICK, in, his official capacity, Commanding General and Chief of Engineers, U.S. Army Corps of Engineers, and | § § § § § § | |
| COL. RICHARD P. PANNELL, in his official capacity, District Engineer and Commanding Officer, Galveston District, U.S. Army Corps of Engineers, and | § § § § § | |
| KIM MCLAUGHLIN, in her official capacity, Chief Regulatory Division, Galveston District, U.S. Army Corps of Engineers, | § § § § § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.     INTRODUCTION AND SUMMARY OF THE CASE

#### A.     What this case is about

1.     This Complaint seeks redress for the near total abdication by the United States Army Corps of Engineers ("USACE") of its responsibilities under federal law to protect from destruction the environmental, recreational, historical and archeological treasures located in and

1

near the Lydia Ann Channel on the Texas Gulf Coast.  Those treasures belong to the people of the State of Texas and of the United States of America.  They are of particular importance to Plaintiff, Friends of Lydia Ann Channel, whose members fish, swim, hunt, boat, study and otherwise directly use and enjoy the unique resources now threatened by the USACE's failure to follow the mandates of numerous federal laws intended to protect just such resources.  Plaintiff's members will also be directly subject to the human health and safety threats posed by the massive amounts of toxic, explosive, and otherwise hazardous chemicals now being brought into and stored in the Lydia Ann Channel, as the direct result of the USACE's failure to comply with federal law.

2.      In January 2015, using an improper and hurried process, and without providing public notice or allowing public comment or requiring any environmental studies or analysis whatsoever, the USACE permitted the building of an enormous commercial facility stretching over a mile and a half along the Lydia Ann Channel that is being used for the servicing and storage of a fleet of up to 240 barges, some loaded with heavy petroleum products and other hazardous chemicals.  In doing so, the USACE ignored or paid lip service to the concerns of other federal and state agencies, and of employees of the USACE itself.  Perhaps most troubling, the USACE authorized this enormous industrial facility based on the representations of an individual who (i) had pled guilty to charges he had filed fraudulent permit applications with the City of Corpus Christi and attempted to bribe a city official, (ii) used an obvious alias in his dealings with the USACE, and (iii) apparently had a personal relationship with USACE personnel.

3.      Plaintiff, a Texas nonprofit organization, seeks declaratory and injunctive relief against the USACE and three of its executive employees for their failure to comply with the

Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"); the implementing regulations for NEPA issued by the White House Council on Environmental Quality, 40 C.F.R. §1500 et seq. ("CEQ" and "the CEQ Regulations"); regulations issued by the USACE, 33 CFR Part 230 ("the USACE Regulations") to implement the NEPA and CEQ regulations; regulations issued by the USACE in 33 CFR Part 320, 322, and 325 relative to the issuance of permits for certain activities described herein; the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"); and the ESA implementing regulations, 50 CFR Part 17, 222, 223, 224 and 402.

4.     Defendants' failures have also violated The Marine Mammal Protection Act, the National Historic Preservation Act, the Fish and Wildlife Coordination Act, and the implementing regulations thereunder.  Plaintiff asserts no direct claims under these additional statutes because Defendants' violations are subsumed within the relief Plaintiff seeks under the statutes and regulations set out above in ¶ 3.

### B.     What is at stake - The Lydia Ann Channel

5.     Situated between the Aransas National Wildlife Refuge and the Padre Island National Seashore, the ecological, navigational and recreational importance of the Lydia Ann Channel cannot be overstated.  It is a major conduit of tidal waters from the Gulf of Mexico to the Aransas Bay system, including Aransas, Copano, Mission, St. Charles and Redfish Bay.  Any hazardous or toxic materials spilled in the Lydia Ann Channel would therefore be transported by tidal flows directly into these environmentally sensitive and ecologically important areas in the Aransas Bay System.  The Lydia Ann Channel is located within the Redfish Bay State Scientific Area and is directly adjacent to the Mission-Aransas National Estuarine Research Reserve.  In June, 2000, Redfish Bay was designated a State Scientific Area by the Texas Parks and Wildlife

Commission for the purposes of protecting and studying native sea grasses located there. According to the Texas Parks and Wildlife Department website, "[Redfish Bay State Scientific Area] has about 50 square miles (32,000 acres) of prime fishing habitat, including 14,000 acres of submerged sea grass beds, dominated by turtle grass (*Thalassia testudinum*) and shoal grass (*Halodule beaudettei*). Redfish Bay contains the northernmost extensive stands of seagrass on the Texas coast and they are well worth the effort to protect them."[1] The location, boundaries, and ecological significance of this area is evident from the Texas Parks and Wildlife Redfish Bay State Scientific Area Map:



[1] http://tpwd.texas.gov/landwater/water/habitats/seagrass/redfish.phtml.

6.      The immediate area in which the Lydia Ann Channel is located is considered one of the best places on earth to fish for tailing red drum.  As reported on a leading sport fishing site: "There are numerous cuts, flats and reefs along both sides of the Lydia Ann Channel and just about any of the bays' game fish can be targeted along its path."[2]

7.      This area has also been repeatedly hailed by *Texas Parks and Wildlife Magazine* as the best place in Texas to paddle and kayak.  In the words of the magazine: "The Lighthouse Lakes trail, near Port Aransas, was the first official paddling trail, and it offers kayakers a mix of mangrove mazes and open flats, with excellent fishing and birding opportunities and views of the Lydia Ann Lighthouse."

8.      The Channel is also home or adjacent to the habitat of at least eight endangered species - whooping cranes, piping plovers, rufa red knots, and five separate species of endangered sea turtles.  At least one significant marine archeological site is located in the Lydia Ann Channel and one of the few 19th century lighthouses remaining on the Texas Coast, the Aransas Pass or Lydia Ann Lighthouse, originally built in 1857, still stands on the bank of the Channel - directly adjacent to the newly-built barge fleeting facility at issue.

9.      A portion of the Intracoastal Waterway is routed through and follows the natural contours of the Lydia Ann Channel, both of which serve as a major navigational route for recreational and commercial vessels.

> **C.     The USACE's failure to implement procedures to protect the Lydia Ann Channel and its unique resources**

10.     On January 15, 2015, the USACE authorized by Letter of Permission a bare-bones permit application submitted by Lydia Ann Channel Moorings LLC ("LAC Moorings")

---

[2] http://coastalbendfishing.com.

(DA Number SWG-2014-00460) to build a large industrial barge fleeting facility[3] extending a mile and half along the Lydia Ann Channel for the storage and servicing of a fleet of up to 240 industrial barges.  The barge fleeting facility advertises that it is one of the largest such facilities in Texas and that it can accommodate "CDC Barges," "Hot Oil Barges" and "Red Flag Barges."[4] "Red flag barges" are barges that carry hazardous materials.  "Hot oil barges," as the name suggests, carry heavy petroleum products such as tar or asphalt.  Most alarmingly, CDC barges carry "Certain Dangerous Cargo" which is defined in federal regulations to include explosives, poisons, corrosive chemicals and radioactive materials.  33 C.F.R. § 160.202.

11.    The USACE's permit was based on printed forms and a one-page explanation, together with representations made by the point person for LAC Moorings, a man who used the name "Mike Edwards" in his dealings with USACE.  His real name is Everett Michael Skipper. In 2009 Everett Michael Skipper pled guilty to attempted bribery of a public official, and to tampering with government documents in connection with  fraudulent permit applications submitted to the City of Corpus Christi. Even a cursory background check, such as a Google search, would have revealed that "Mike Edwards" was not who he appeared to be, and that any application involving him should have required careful scrutiny.

12.    The USACE permit application was submitted by Skipper's step son-in-law, Christopher Todd Pietsch, who listed his contact email address as MikeSkipper54@aol.com. Evidence suggests that LAC Moorings used Skipper to obtain authorization from the USACE because he had personal relationships with key USACE employees.

---

[3] U.S. Coast Guard regulations define a "barge fleeting facility" as "a commercial area . . . the purpose of which is for the making up, breaking down, or staging of barge tows."  33 C.F.R. § 101.105.

[4] http://lacfleet.com/services/

13.     Despite the enormous size of the proposed industrial facility, and the environmental, navigational and recreational importance of the Lydia Ann Channel, the USACE authorized the facility sought by Skipper by issuing a Letter of Permission using an expedited, short-cut procedure intended solely for small, minimal-impact and non-controversial projects. The USACE approved the project without any public notice or public comment, without any review of alternative locations, and without conducting or requiring any environmental studies or analysis whatsoever.

14.     Even though the USACE was aware of the presence of multiple federally-listed threatened and endangered species, the USACE performed no impact studies and required LAC Moorings to perform no such studies.  Despite the known presence of federally-listed endangered species, the USACE failed to consult with the United States Fish and Wildlife Service or the National Marine Fisheries Service as required under Section 7 of the Endangered Species Act.

15.     After a meeting with representatives of other federal and state agencies in which insufficient and misleading information about the facility and its potential impacts was provided, the USACE Regulatory Division, which authorized the facility, failed to take action on the concerns and comments specifically expressed by those agencies, and by other divisions of the USACE itself:

- The USACE Regulatory Division ignored the serious concerns raised by the USACE Operation Divisions, Navigation Branch that the proposed "industrial barge facility" posed a hazard to navigation because it is in a bend of the Gulf Intracoastal Waterway ("GIWW") and in a high-traffic area that is influenced by sea conditions.

- The USACE Regulatory Division ignored the concerns raised by the USACE Operation Divisions, Navigation Branch that until a safety set-back was established for the GIWW in the Lydia Ann Channel, the facility and the barges containing hazardous and dangerous cargo posed a serious threat to navigation and safety.

- The USACE ignored the comments of the Texas Parks and Wildlife Department ("TPWD") regarding impacts on federally-listed sea turtles, which are protected by the ESA.

- The USACE ignored the comments of the TPWD regarding impacts to federally-protected marine mammals, which are protected by the Marine Mammal Protection Act.

- The USACE failed to address or act on the comments of the TPWD regarding the need to identify, avoid, and compensate for impacts to seagrass beds.

- The USACE failed to address or act on the comments of the TPWD regarding the need for the applicant, LAC Moorings, to develop an emergency pollution action plan and include it as part of revised project plans.

- The USACE failed to address or act on the comments of the TPWD regarding the need for LAC Moorings to provide information on how the mooring dolphins for the barge facility would be installed and include it as part of revised project plans.

- The USACE ignored the comments of the TPWD regarding the need for LAC Moorings to coordinate with the Texas General Land Office Oil Spill Response Division and the U.S. Coast Guard to develop a risk assessment of the local habitats and a pollution response plan and include them as part of revised project plans.

- After specifically instructing LAC Moorings to evaluate and consider impacts to certain known historical sites, the USACE ignored the adverse impacts to the Aransas Pass Light Station, which is listed on the National Register of Historic Places, and which is directly adjacent to the industrial barge facility.

- After specifically instructing LAC Moorings to evaluate and consider impacts to certain known historical sites, the USACE failed to consider adverse impacts to the recorded historic shipwreck of the tanker *John Worthington* (Texas archeological site number 41AS88), located directly adjacent to the barge industrial facility.

16.     On September 9, 2015, Plaintiff sent the USACE a 23-page notice letter in accordance with Section 11(g) of the Endangered Species Act detailing the USACE's violations of Section 7 and Section 9 of the Endangered Species Act, as well as other failures to follow federal law before authorizing LAC Moorings to construct a one and a half mile long industrial barge facility in the middle of the Lydia Ann Channel.  Plaintiff explained in detail how the USACE failed to comply with the decision-making procedures set forth in NEPA, the CEQ and

8

USACE regulations, as more fully described herein, and failed to comply with the USACE's own regulations and procedures for the issuance of permits as provided in 33 CFR Parts 320, 322, and 325.

17.    Plaintiffs also notified the USACE that Skipper (a/k/a "Mike Edwards") and LAC Moorings provided the USACE with incomplete and misleading information about the proposed facility, and that the facility as constructed and operated differs greatly from what the USACE authorized.  The USACE's Letter of Permission expressly provides that the USACE may reevaluate or revoke the permit if LAC Moorings fails to comply with the Letter of Permission, is found to have provided "false, incomplete or inaccurate" information to obtain the permit, or if "new information surfaces which this office did not consider in reaching the original public interest decision."

18.    More than three months after receiving Plaintiff's detailed, 23-page letter, and despite its authority to reevaluate the Letter of Permission based on the new information and the actual operations and impact of the enormous barge facility, the USACE has done nothing.

### D.    Plaintiff's causes of action

19.    USACE's rushed authorization of the construction and operation of this mile and a half long industrial barge facility accommodating hazardous materials in the middle of one of the most ecologically and recreationally significant waterways along the Texas gulf coast threatens known endangered species habitat, interferes with and displaces public recreational activities such as fishing, swimming, hunting, boating, and birding, and constitutes a threat to both navigation and to public health and safety.

20.    The Defendants' actions have caused and are causing Plaintiff and its members irreparable environmental harm in the form of significant impacts to the riparian and aquatic

environment of the Lydia Ann Channel and Redfish Bay State Scientific Area, degradation of habitat for fish, birds, marine mammals, and other wildlife, and are adversely affecting listed endangered species and their habitat in violation of NEPA, the TCEQ Regulations, the USACE Regulations, and the ESA.  Plaintiff seeks declaratory and injunctive relief for those violations, and for the resulting violation of the APA.  *See* 5 U.S.C. §§ 702 and 706(2)(A).

## II.  JURISDICTION AND VENUE

21.  This Court has original jurisdiction and the authority to grant the relief requested pursuant to 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States: 16 U.S.C. §1531 *et seq.* (ESA), 5 U.S.C. §§701 *et seq.* (APA), and 42 U.S.C. § 4321 *et seq.* (NEPA).  The Court also has jurisdiction pursuant to 28 U.S.C. § 1361 because the suit is brought against officers of the United States to require them to perform their duties under federal law. This Court has the authority to grant the relief requested pursuant to 5 U.S.C. § 703, 28 U.S.C. § 2201 *et seq.*, and 33 U.S.C. §§ 1319(d) and 1365(a).

22.  Plaintiff has satisfied the ESA's jurisdictional requirements for bringing this suit. Pursuant to 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiff notified Defendants of their violations of the ESA, and of Plaintiff's intent to sue under the ESA for those violations by certified letter dated and postmarked September 9, 2015 ("Notice Letter"), attached as Exhibit 1. The allegations in the Notice Letter are incorporated herein by reference.

23.  Plaintiff also gave notice of its intent to sue by sending the Notice Letter, on September 9, 2015, to Sally Jewell, Secretary of the Interior, and Penny Pritzker, Secretary of Commerce.

24.  More than sixty days have passed since the Notice Letter was served, and the violations complained of are continuing and are reasonably likely to continue to recur. The

named Defendants have not taken any actions to remedy or prevent continued violations of the ESA. Neither the Secretary of the Interior nor the Secretary of Commerce have commenced any action to impose a penalty pursuant to 16 U.S.C. § 1540(a), and the United States has not taken any action to prevent continued violations of the ESA.

25.     Venue is appropriate in the Corpus Christi Division of the Southern District of Texas under the ESA, 16 U.S.C. § 1540(g)(3)(A), because alleged violations have occurred and continue to occur in this district. Venue is also proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the federal agency actions and omissions giving rise to the claims occurred in this District, and the industrial barge facility is located within this District.

### III.     PARTIES

26.     Plaintiff, Friends of Lydia Ann Channel, is a domestic non-profit corporation organized and existing under the laws of the State of Texas, with its principal office in Port Aransas, Texas.  Plaintiff and its members are dedicated to the conservation and protection of the recreational use and ecological importance of Lydia Ann Channel, the adjacent Lighthouse Lakes estuary, San Jose Island, and related bays, marshes, and other bodies of water near Port Aransas, Texas.  Plaintiff seeks to protect and restore environmental quality in those areas through educational and other activities.  Plaintiff's members live in the immediate area of Port Aransas and, in particular, the Lydia Ann Channel. Other members have frequently traveled to and will continue to travel to the Port Aransas area and to the Lydia Ann Channel.  Prior to the USACE's authorization of construction and operations of its industrial barge fleeting facility, Plaintiff's members derived substantial benefit and enjoyment from the Lydia Ann Channel and its environs in fishing, hunting, boating, swimming, wildlife observation and photography, and other similar activities.

27.     Plaintiff's members are injured by Defendants' violations of the ESA, NEPA, and the APA.  Specifically, Plaintiff's members have been severely affected by Defendant's approval of the enormous barge fleeting facility, which was hastily constructed in the Lydia Ann Channel, in and adjacent to the areas where Plaintiff's members live and recreate.  The facility has caused and is causing the contamination of the water in and around Lydia Ann Channel, and the pollution of the air Plaintiff's members breathe.  The facility caused and is causing ongoing harm, harassment, injury, and habitat destruction of endangered species and other wildlife, and is otherwise adversely affecting the environmental, recreational, historical and navigational resources used and enjoyed by Plaintiff's members.

28.     Defendant United States Army Corps of Engineers is an agency of the United States of America, within the Department of the Army, and has been delegated responsibility for management and operation of various rivers, lakes and other water resources of the United States of America, and the issuance, modification and revocation of permits relative to various activities taken or proposed to be taken on waters of the United States and its tributaries.  As a federal agency, the USACE must comply with federal law, including NEPA and the ESA. The Letter of Permission for the commercial barge fleeting, storage, and service facility constructed and operated in Lydia Ann Channel was processed and approved by the USACE's Corpus Christi Regulatory Field Office, Galveston District, which is located at 5151 Flynn Parkway, Suite 306 in Corpus Christi, Texas.

29.     Defendant Lt. General Thomas P. Bostick ("Bostick") is the Commanding General and Chief of Engineers of the USACE. Defendant Bostick is responsible for ensuring that the USACE, including officials and employees under his supervision, complies with all applicable federal laws, including NEPA and the ESA. Defendant Bostick is sued in his official

capacity. Defendant Bostick's office address is: United States Army Corps of Engineers, 441 G Street NW, Washington, DC 20314-1000.

30.     Defendant Col. Richard P. Pannell ("Pannell") is the District Engineer and Commanding Officer of the Galveston District of the USACE. Defendant Pannell is responsible for implementation of the policies, procedures and requirements of the USACE, and for ensuring that the USACE, including officials and employees under his supervision, complies with applicable federal laws, including NEPA and the ESA, in the USACE's Galveston District. The Lydia Ann Channel is a part of the water resources of the United States overseen and managed by the Galveston District. Defendant Pannell is sued in his official capacity.  Defendant Pannell's office address is: United States Army Corps of Engineers, Galveston District, 2000 Fort Point Road, Galveston, TX  77550.

31.     Defendant Kim McLaughlin ("McLaughlin") is the Chief of the Regulatory Division of the Galveston District of the USACE. Defendant McLaughlin issued the Letter of Permission that allowed the construction and operation of the commercial barge fleeting, storage, and service facility in Lydia Ann Channel. Defendant McLaughlin is sued in her official capacity. Defendant McLaughlin's office address is: United States Army Corps of Engineers, Galveston District, 2000 Fort Point Road, Galveston, TX  77550.

## IV.    LEGAL REQUIREMENTS

### A.    The National Environmental Policy Act (42 U.S.C. 4321 *et seq.*)

32.    In 1969, Congress enacted NEPA, "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth... and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man." NEPA §101(a), 42 USC §4331(a).   Congress declared it to be "the continuing policy of the Federal Government ... to use all practical means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans." *Id.*

33.    To achieve those goals and policies, Section 102(2) of NEPA requires federal agencies to prepare, consider, and approve an Environmental Impact Statement for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An Environmental Impact Statement must contain a detailed statement by the responsible official on (i) the environmental impact of the proposed action, (ii) the adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  NEPA, §102(c), 42 USC §4332(c).

34.    The fundamental purpose of an Environmental Impact Statement is to force the decision-maker to ensure that the policies and goals defined in the NEPA are infused into the ongoing programs and actions of the federal government. 40 C.F.R. § 1502.1.  NEPA places on

all federal agencies the responsibility to help ensure "for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings," as well as "the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4321(b)(2) & (3).

**B.     The NEPA regulations**

35.     Pursuant to NEPA and Executive Orders No. 11514 and 11991, the White House Council on Environmental Quality ("CEQ") promulgated regulations fleshing out the requirement of NEPA that Federal Agencies prepare environmental assessments and impact statements for proposed federal actions. 40 CFR Part 1500 *et seq.* (the "CEQ Regulations).  The heart of the requirements is that an agency "rigorously explore and objectively evaluate" the projected environmental impacts of all "reasonable alternatives" for completing the proposed action. 40 CFR §1502.14.

36.     Under the CEQ regulations, the process of assessing the environmental impact of a proposed Federal action is divided into three major steps:

(i)     Preparation of an Environmental Assessment, 40 CFR §1501.3, which is defined as a "concise public document that serves to briefly provide sufficient evidence and analysis for determining whether to prepare a much needed more detailed Environmental Impact Statement, or a finding of no significant impact."  40 CFR §§ 1501.3 and 1508.9.

(ii)     Depending on the results of the Environmental Assessment, proceed to (i) prepare an Environmental Impact Statement; or (ii) prepare a Finding of No Significant Impact.  40 CFR §1501.4.

(iii)     If the agency determines that there may be a "significant effect" of the proposed action on the environment, it must prepare an Environmental Impact Statement.  *Id.*

37.     The CEQ Regulations emphasize the importance of public notice to the required process.   An agency must "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" by (i) providing public notice, (ii) holding public hearings, particularly if there is "substantial environmental controversy concerning the proposed action," (iii) solicit appropriate information from the public, and (iv) explain where members of the public can obtain more information on the proposed action.  40 C.F.R. § 1506.6.

38.     Whether a proposed action of a Federal agency may have a "significant effect" on the environment requires considerations of both context and intensity. 40 CFR §1508.27. "Context" means that an action must be viewed in terms of the scope of its effect (local, regional, national), and the interests affected.  *Id.* Intensity refers to the severity of impact, and involves weighing of factors contained in 40 CFR §1508.27, including (i) the degree to which the proposed action affects public health or safety; (ii) unique characteristics of the geographic area including proximity to historic or cultural resources, park lands, wetlands or ecologically critical areas; (iii) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (iv) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (v) the degree to which the action may affect objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (vi) whether the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and (vii) whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.  40 C.F.R. § 1508.27(b).

C.       **USACE Permitting Regulations.**

39.     NEPA requires that each federal agency develop regulations designed to implement the requirements of NEPA in that agency's activities.  NEPA §103, 42 USC §4333. Pursuant to that requirement, the USACE has developed regulations found at 33 CFR § 230.1 *et seq*.  Regulations providing for public notice and public feedback, the preparation of environmental assessments and other procedures necessary for the USACE's issuance of a permit are contained in 33 CFR Part 325 and appendixes thereto.

40.     Pursuant to those procedures, when an application is filed, a single point of contact must be designated in the USACE District Office to coordinate the regulatory process, including the NEPA procedures, so as to be fully aware of the substance of the information required for use in preparing an Environmental Assessment or an Environmental Impact Statement in accordance with 33 CFR Part 230, Appendix B.  Section 325.2 of the USACE regulations provides that a "decision on a permit application *will require* either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion."  (emphasis added).

41.     Section 230.6 of the regulations provide that the authorization and construction of a major project and major *changes in the operation or maintenance of completed projects* normally require an EIS.

1.       Under the USACE regulations, public notice and public comment are critical to the USACE's evaluation of a permit application.

42.     The USACE regulations are explicit in explaining the central importance of public notice to the evaluation of a permit application:

The public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information *necessary to evaluate the probable impact on the public interest*.  The

notice *must*, therefore, include sufficient information to give a clear understanding
of the nature and magnitude of the activity to generate meaningful comment.

*Id*. § 325.3(a) (emphasis added).

43.      Within 15 days of receipt of an application, the USACE District Office is required to issue a public notice, unless specifically exempted by other provisions of the regulations. 33 C.F.R. § 325.2(a)(2).  The USACE regulations contain detailed requirements for the content of the public notice that are key to the USACE's procedural obligations under NEPA and other statutes.  With respect to the Endangered Species Act, the regulations provide that:

> The district engineer *will* include a statement in the public notice of his current knowledge of endangered species based on his initial review of the application (see 33 CFR 325.2(a)(2)).  If the district engineer determines that the proposed activity would not affect listed species or their critical habitat, he *will* include a statement to this effect in the public notice.  If he finds the proposed activity may affect an endangered or threatened species or their critical habitat, he *will* initiate formal consultation procedures with the U.S. Fish and Wildlife Service or National Marine Fisheries Service.  Public notices forwarded to the U.S. Fish and Wildlife Service or National Marine Fisheries Service will serve as the request for information on whether any listed or proposed to be listed endangered or threatened species may be present in the area which would be affected by the proposed activity, pursuant to section 7(c) of the Act.

33 C.F.R. § 325.2(b)(5) (emphasis added).

44.      The regulations provide detailed requirements for the information the district engineer must include in the public notice, including "current knowledge on historic properties," "sufficient information concerning the nature of the activity to generate meaningful comments," and "any other available information which may assist interested parties in evaluating the likely impact of the proposed activity on factors affecting the public interest."  *Id*. § 325.3(a).  The notice must also include the period for public comment and the procedure for requesting a public hearing on the permit application.  *Id*.  § 325.3(a)(15).  The regulations provide that "The district

engineer *will consider* all comments received in response to the public notice in subsequent actions on the permit application." *Id*. § 325.2(a)(3) (emphasis added).

2. The USACE regulation authorizes a narrow exception to the public notice and environmental evaluation requirements for "minor" work with no significant environmental impacts and for which there is no opposition.

45. The USACE regulations provide an exception from the requirements that the district engineer complete an environmental assessment and provide public notice before authorizing a project, but that exception is available only for the most inconsequential of projects. Section 325.2(e)(1) allows the USACE to approve a project using a "Letter of Permission," which is described as "an abbreviated processing procedure which includes coordination with federal and state fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation, but without the publishing of an individual public notice." But to qualify for this shortcut procedure bypassing public comment and environmental assessment obligations, the district engineer must make a determination that the proposed work:

(i) "would be minor,"

(ii) "would not have significant individual or cumulative impacts on environmental values," and

(iii) "should encounter no appreciable opposition."

33 C.F.R. § 325.2(e)(1)(i).

46. It was under this narrow exception that USACE unreasonably and illegally authorized a nearly mile and a half long industrial facility in the middle of one of the most environmentally, recreationally and navigationally significant areas along the Texas coast.

## C.    The Endangered Species Act - Section 9 Violations.

47.    Congress enacted the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved... [and] to provide a program for the conservation of such endangered species and threatened species...." 16 U.S.C. § 1531(b).

48.    Before a species receives critical protection under the ESA, the USFWS must list the species as either "threatened" or "endangered." 16 U.S.C. § 1533. An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is one that is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range." 16 U.S.C. § 1532(20).

49.    Section 9 of the ESA specifically prohibits the "take" of an endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA's take prohibition applies to all listed species. 50 C.F.R. § 17.31.

50.     "Take" is broadly defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(18).

51.    The ESA's legislative history reflects Congress's intent that "take" be given the "the broadest possible" reading to include "every conceivable way" in which any person could harm or kill fish or wildlife. S. Rep. No. 307, 93rd Cong., 1st Sess. 1, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 2995.

52.    "Harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

53.     "Harass" includes any "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

54.     "Take" includes direct as well as indirect harm and need not be purposeful.

55.     The private enforcement of violations of Section 9 are authorized by the ESA's citizen-suit provision. 16 U.S.C. § 1540(g). The ESA expressly authorizes citizens to sue and seek an injunction against any "person" alleged to be responsible for a take, or otherwise in violation of the ESA, including any governmental instrumentality or agency. 16 U.S.C. § 1540(g)(1).

56.     A private plaintiff can seek to enjoin both present activities that constitute an ongoing take and future activities that are reasonably likely to result in take.  As the U.S. Supreme Court has held, Congress has accorded the protection of endangered species the highest of priorities, so courts do not have the discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

57.     A court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is a reasonably certain threat of imminent harm to a protected species.

## D.     The Endangered Species Act - Section 7 Violations.

58.     Section 7(a)(1) of the ESA makes clear that all Federal agencies shall "utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to … this Act." 16 U.S.C. §1536(a)(1).    Section 7(a)(2) of the ESA provides that a federal agency shall "*in*

*consultation with* and with the assistance of [USFWS or NMFS], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species... ." 16 U.S.C. § 1536(a)(2) (emphasis added); 50 C.F.R. § 402.01.

59.     The term "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon the high seas. Examples include, but are not limited to: ... (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

60.     Section 7(a)(2) also provides that in order to meet its obligations under Section 7, a federal agency must "use the **best** scientific and commercial data available." 16 U.S.C. § 1536(a)(2) (emphasis added).

61.     In addition, under Section 7 of the ESA, the federal "action agency," the USACE is required to fully consider and evaluate all the "effects of the action" which include both the "direct' and "indirect effects" of the action. 16 U.S.C. § 1536(a)(2). *Indirect effects* is defined to include any effects caused or induced by the action that are "reasonably certain to occur." 16 U.S.C. § 1536(a)(2).   More simply put, indirect effects are "caused by or result from the proposed agency action, are later in time, and are reasonably certain to occur." U.S. Fish & Wildlife Service & Nat'l Marine Fisheries Service, Endangered Species Consultation Handbook (Mar. 1998), at 4-27 (hereinafter "Consultation Handbook").

62.     Under Section 7 of the ESA, the effects of an action also include "the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. §402.02.

"Interrelated actions" are defined as "those that are part of a larger action and depend on the larger action for their justification." "Interdependent actions" are "those that have no significant independent utility apart from the action that is under consideration." *Id.* Thus, if a particular private activity would not occur "but for" the occurrence of the proposed federal action, the effects of that private action are "interdependent and interrelated" to the federal action, and the effects of that private action are attributable to the federal action under Section 7. Consultation Handbook at 4-26.

63.     Additionally, the "action area" for purposes of Section 7 "means all areas to be affected directly or indirectly by the Federal action and **not merely the immediate area involved in the action**." 50 C.F.R. §402.02 (emphasis added).

64.     Once a permit application is submitted to the USACE, the application must be reviewed to determine if a federally-listed species *may be present* in the action area. Upon determining that a federally-listed species *may be present* in the action area, the USACE is then obligated to determine whether the proposed action "may affect" a listed species. 50 C.F.R. §402.14(a) (providing that agencies should review their actions at the "earliest possible time to determine whether an action may affect listed species or critical habitat."). The term "*may affect*" is not defined in the ESA or the Joint Consultation Regulations, but the USFWS and NMFS Consultation Handbook defines it as: "the appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat." Consultation Handbook at xvi. This definition, combined with the breadth of the "effects of the action," sets the "may affect" threshold quite low. Consultation Handbook section 5.3 (discussing "effects of the action").

65.     If the activity in the permit application may affect an endangered or threatened species or their critical habitat, the USACE must initiate formal consultation procedures with the USFWS or NMFS. 16 U.S.C. § 1536(a); 33 C.F.R. § 325.2(b)(5).

66.     Once ESA consultation is initiated, the federal agency and the permit applicant are prohibited from making an "irreversible or irretrievable commitment of resources . . . [that] has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives" that could avoid jeopardizing the listed species or their habitat. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

## V.      BACKGROUND FACTS

### A.      The area at issue.

67.     The Lydia Ann Channel and the affected shoreline of San Jose Island are located within Redfish Bay State Scientific Area, directly adjacent to the Mission-Aransas National Estuarine Research Reserve, and are home to or immediately adjacent to known habitat for at least eight federally-listed endangered species:  piping plover (*Charadrius melodus*), rufa red knot (*Calidris canutus rufa*), whooping crane (*Grus americana*), Atlantic hawksbill sea turtle (*Eretmochelys imbricata*), green sea turtle (*Chelonia mydas*),  Kemp's ridley sea turtle (*Lepidochelys kempii*), leatherback sea turtle (*Dermochelys coriacea*), and loggerhead sea turtle (*Caretta caretta*).  As discussed above, the Lydia Ann Channel and San Jose Island have been used by the public for decades for recreational purposes, including fishing, hunting, swimming, boating, crabbing and wildlife photography and observation. Redfish Bay State Scientific Area is also a favorite among anglers because it contains fifty square miles of prime fishing habitat including the northernmost extensive seagrass beds on the Texas coast and the famous Lighthouse Lakes estuary, which is considered to be one of the preeminent locations on earth to fish for

tailing red drum.  Redfish Bay State Scientific Area, the Mission-Aransas National Estuarine Research Reserve, and the Lighthouse Lakes are also the site of the Lighthouse Lakes Paddling Trail, established in 1999 by Texas Parks and Wildlife ("TPWD") as the first Texas Paddling Trail.

### B.     The LAC Moorings Permit Application and the role of Everett Michael Skipper (a/k/a "Mike Edwards").

68.     On June 10, 2014, the USACE received an Application for Department of the Army Permit for the Lydia Ann Moorings Project ("Permit Application").  The "applicant" is listed as Christopher Todd Pietsch with Lydia Ann Channel Moorings, LLC, and the "authorized agent" is identified as Robert Bryan Gulley, who is also stated to be with Lydia Ann Channel Moorings, LLC.  The email address listed on the Permit Application for Mr. Pietsch and Mr. Gulley is the same for both: MikeSkipper54@aol.com.

69.     In spite of the representations on the permit application that Pietsch was the applicant and Gulley was the agent, it is clear that an individual calling himself "Mike Edwards" played the principal role in lobbying the USACE to authorize the project, and he did so with a minimum of scrutiny.  He was apparently effective in doing so -- the USACE relied upon the oral and written representations of "Mike Edwards", and appear to have been influenced in making the determination to issue the Letter of Permission by his apparent relationships with individuals working in the USACE Galveston District.

70.     "Mike Edwards" is an alias used by an individual whose real name is Everett Michael Skipper.

71.     The  email address listed for both Pietsch and Gulley on the Permit Application, MikeSkipper54@aol.com, is in fact Everett Michael Skipper's email address.

72.     The home phone number listed for Pietsch on the Permit Application, 361-688-4260, is in fact the number for the mobile phone of Everett Michael Skipper.

73.     In documents and in internal emails, the USACE refers to "Mr. Mike Skipper Edwards" as the applicant.

74.     In 2008 Everett Michael Skipper was indicted for tampering with government records, a class A misdemeanor. The indictment was the result of Skipper signing fraudulent permit applications filed with the City of Corpus Christi using the alias "Mike Edwards".

75.     Everett Michael Skipper was also indicted in 2008 for bribery, a second degree felony, resulting from Skipper's attempt to bribe the City of Corpus Christi's Fire Marshal in exchange for the issuance of a certificate of occupancy for a local bar.

76.     In 2009, Everett Michael Skipper pled guilty to the bribery charge and admitted his guilt for the tampering with government records charge.

77.     Everett Michael Skipper again used the false identity of "Mike Edwards" in order to lobby the USACE to issue the Letter of Permission without any meaningful regulatory review, and in direct violation of federal law.

78.     It does not appear that the USACE made any meaningful effort to clarify, learn about, or investigate the cast of characters with whom they were dealing.

> **C.     Skipper's permit application, which misrepresented the intended scope and magnitude of the proposed barge fleeting facility and omitted key information, is fast tracked by the USACE.**

79.     On the same date it received the application, the USACE Regulatory Division, Corpus Christi Regulatory Field Office issued a "Notice of Application - Internal USACE Review" ("NOA for Internal Review").  This NOA for Internal Review indicated that comments

were due by June 17, 2014 (i.e., within 5 working days).   The complete "Project Description" in

the Notice of Application for Internal Review consists of one paragraph:

> The applicant proposes to install 82 individual mooring dolphins 100-feet apart on
> the east side of the Lydia Ann Channel to provide temporary mooring for barges
> and tugs inside Lydia Ann Channel. The mooring structures will be 24-inch steel
> pipe with rubber tires acting as bumpers, concrete filled, and placed 30-feet below
> the bottom surface of the channel.  The applicant's plans are enclosed in 7 sheets.

The 7 sheets of the "applicant's plans" include the following:

> Page 1 – A Google Earth photo showing generally where the project is
> located using a "dropped pin."

> Page 2 – A satellite image with a white line representing the
> "approximate" edge of Lydia Ann Channel and a blue line showing the
> "approximate" edge of the mooring dolphin line.

> Pages 3 to Page 6 – "Bathymetric Survey" exhibits.  Page 3 has "Proposed
> Barge Fleeting Area" handwritten at the bottom of the page. Pages 4, 5, and 6 are
> partially labeled "PROPOSED LAYOUT"; however, in addition to depth levels
> written on the pages, there are several unidentified rectangles drawn on the page,
> several of which are actually drawn on top of what is shown as dry land.

> Page 7 – An email with the subject "Pilings" sent on 5/20/2014 from
> capt.1313@yahoo.com to MIKESKIPPER54@aol.com.  This email consists of a
> photo of what appears to be a hand-drawn rendering of what one of the proposed
> mooring dolphins might look like above the water line.  It does not appear to be to
> scale, and no scale is indicated.  At the bottom of the page is handwritten the
> following: "Design Proposal 24" Steel Pipe, Concrete Filled, 30' below mud
> line."

80.    The USACE failed to include in the "project description" any mention of the fact

that the project was to be a commercial industrial barge fleeting, storage, and service  facility that

would be handling up to 240 barges containing petrochemical products, dangerous chemicals,

and hazardous cargo.  It also failed to recognize and disclose that this commercial industrial

barge fleeting, storage, and service facility would be operating 24 hours a day, 7 days a week,

365 days a year, and that the tugs pushing and positioning the barges in the storage area would

be consistently operating with their propellers in and around sea grass beds and in very close proximity to sensitive shoreline environments and to a significant marine archeological site.

> **D.    After providing incomplete and misleading information, the USACE solicits the comments of other agencies but then fails to act on the comments received.**

81.    On July 18, 2014, the USACE Corpus Christi Regulatory Field Office sent an Interagency Coordination Notice for Letter of Permission ("ICN") to the following Resource Agencies: the Environmental Protection Agency, the U.S. Fish and Wildlife Service ("USFWS"), the National Marine Fisheries Service ("NMFS"), the Texas Parks and Wildlife Department ("TPWD"), the Texas Historical Commission, the Texas General Land Office ("TxGLO"), the U.S. Coast Guard, the Coastal Coordination Council, the Port of Corpus Christi Authority, the Aransas County Navigation District, the San Patricio County Navigation District, and the Victoria County Navigation Commission (collectively referred to as the "Resource Agencies"). The ICN directed these agencies to "respond within 15-calendar days from the date of this letter."

82.    In the July 18 ICN, the USACE communicated the following incomplete and misleading information to the Resource Agencies:

> The applicant proposes to install 82 individual mooring dolphins 100-feet apart on the east side of the Lydia Ann channel [sic] to provide temporary mooring for barges and tugs inside Lydia Ann Channel. The mooring structures will be 24-inch steel pipe with rubber tires acting as bumpers, concrete filled, and placed 30-feet below the bottom surface of the channel.

> The applicant has not proposed to mitigate for the proposed impacts.

> The applicant has not stated that they have avoided and minimized the environmental impacts.

> The project site conditions are currently open water estuarine habitat and a sandy, unconsolidated bottom.

The project is located in the Lydia Ann Channel in Aransas County, Texas; approximately 2-miles north of Port Aransas, Nueces County, Texas. … A copy of the plans, in 7 sheets, is enclosed for your review.

83.     In the July 18 ICN, the USACE did not fully and accurately describe the proposed project to the Resource Agencies.   The "plans, in 7 sheets" which the USACE included with the ICN (specifically detailed above) provided no useful information or clarity to the Resource Agencies, and completely failed to represent the barge fleeting, storage, and service facility that was to be constructed and operated by LAC Moorings. No information was provided to the Resource Agencies regarding the hazardous substances that the applicant intended to store indefinitely in the barges or the close proximity of the hazardous substances to endangered species, their habitats, and other environmentally sensitive features.

84.     In order to be completely forthcoming and factually accurate, the USACE should have fully disclosed to the Resource Agencies that LAC Moorings intended to construct and operate a permanent industrial barge fleeting facility which was capable of holding 240 barges containing petrochemical products, dangerous materials, and hazardous cargo. Further, in order to be fully accurate, the USACE should have fully considered and disclosed the potential impacts on endangered species and the human and natural environment.

85.     In addition, the USACE, <u>without any information, surveys, studies, or analysis to support their position</u>, reached the indefensible and incorrect conclusion that the proposed project would have "no effect" on listed species.

86.     Failing to disclose the total absence of any factual or investigatory support, the USACE specifically represented to the Resource Agencies (falsely) that: "Preliminary indications are that no known threatened and/or endangered species or their critical habitat will be affected by the proposed work."

87.   On July 22, 2015, Pat Clements of the USFWS Texas Coastal Ecological Services Field Office in Corpus Christi replied to the USACE by email. This email states that:

> The U.S. Fish and Wildlife Service (Service) has reviewed, and has No Objection to the authorization of Interagency Coordination Notice (ICN), dated July 18, 2014, for Department of the Army, U.S. Corps of Engineers (USACE), Permit Application SWG-2014-00460.   The applicant, Lydia Ann Channel Moorings, LLC, has requested authorization to install mooring dolphins in navigable waters.

The email emphasized that USFWS was relying entirely on USACE in assuming no effect on endangered species:

> Also, the permit application indicates that you have determined that the proposed action would have no effect on federally listed endangered species or critical habitat.   The Service does not provide concurrence on no effect calls; however, we believe that your agency has complied with section 7(a)(2) of the Endangered Species Act by making a determination.

88.   It is clear from this email that the USFWS understood and believed, based on LAC Moorings' and the USACE's representations, that the proposed project was limited to the description provided by LAC Moorings and the USACE to merely "install mooring dolphins in navigable waters." In spite of this, the USFWS specifically notified the USACE that it was not providing concurrence with the USACE's "no effect" determination.

89.   On July 30, 2014 TPWD sent a comment letter to the Corpus Christi Regulatory Field Office.   As did the USFWS, the TPWD believed, based on LAC Moorings' and the USACE's representations, that the proposed project was limited to simply the installation of individual mooring dolphins for temporary mooring.   In spite of not being fully informed of the actual scope, operations, or impacts of the industrial barge fleeting, storage, and service facility to be constructed and operated by LAC Moorings, the TPWD specifically stated in the July 30 letter that the applicant LAC Moorings should provide to the USACE and the Resource Agencies revised project plans which specifically addressed six specific recommendations:

(1)     The need for LAC Moorings to acquire a lease from the TxGLO.

(2)     The need for LAC Moorings to identify, avoid and and/or compensate for the potential impacts to seagrass beds in the immediate project vicinity.

(3)     The need for LAC Moorings to develop an emergency pollution action plan.

(4)     The need for LAC Moorings to provide information on how the mooring dolphins will be installed in the channel.

(5)     The need for LAC Moorings to develop a monitoring program and action plan to ensure marine mammals and sea turtles will not be impacted.

(6)     The need for LAC Moorings to coordinate with the TxGLO Oil Spill Response Division and the U.S. Coast Guard to develop a risk assessment of the local habitats and a pollution response plan.

90.     The July 30 TPWD letter specifically notified the USACE that "**[d]ue to the proximity of the channel to the Aransas jetties and the Gulf of Mexico, there is a high probability of marine mammals and/or sea turtles in or near the project area.**") (emphasis added).   As noted above, the TPWD specifically recommended that the USACE should ensure that LAC Moorings "develop a monitoring program and action plan, during the mooring installation, to ensure marine mammals and sea turtles will not be impacted."

> **D.     LAC Moorings fails to implement a program to protect marine mammals and sea turtles, but the USACE approves the barge facility anyway.**

91.     The USACE sent a notice letter dated August 12, 2014 to LAC Moorings requesting additional information addressing the TPWD comments. The letter opens by claiming that the "Corps of Engineers (Corps) published a notice on July 18, 2014, to advise the public of your proposed activity." (emphasis added). *This statement is completely false*.  The USACE failed to provide any public notice whatsoever regarding any part of the LAC Moorings project.

92.     The August 12 USACE letter expressly notified LAC Moorings that additional analysis and substantive information was needed and that the concerns raised by the TPWD must

be given full consideration before the USACE could make a final decision on LAC Moorings' application.  The letter stated "If you do not submit the information requested, **in its entirety**, within 30 days from the date of this letter, we will assume that you no longer wish to pursue this permit and your application **will be withdrawn**." (emphasis added).

93.     LAC Moorings did not respond at all to some of the TPWD's concerns, and provided unverified assertions and assurances for others.  Most significant for purposes of this lawsuit, LAC Moorings never responded to the request to develop a program to ensure marine mammals and sea turtles would not be impacted.  Contrary to its own letter and applicable legal requirements, the USACE authorized the project anyway.

### E.     The barge facility negatively affects endangered species and the general environment in a multitude of ways.

94.     The barge facility causes enormous potential for significant environmental contamination as the direct result of runoff and washover from the numerous empty and loaded CDC barges, hot-oil barges and red flag barges that are located and stored in the facility.

95.     The substantial amount of concentrated barge and tug activity associated with this industrial facility and its hazardous contents has substantially increased under water noise.  The substantial increase in large, concentrated tugboat traffic is degrading the marine habitat used by sea turtles in the area.

96.     The presence of this industrial barge facility is also resulting in the discharge of oil, gas, and raw sewage into sensitive estuarine and coastal habitats, which creates a significant risk of injury and death to individual rufa red knots and to other endangered species in direct violation of Section 9 of the ESA.

97.     Turtles swimming or feeding at or just beneath the surface of the water in and around the barge facility are particularly vulnerable to boat and vessel strikes, which will

invariably result in propeller injuries and death to individual sea turtles in direct violation of Section 9 of the ESA.

98.     The large amount of artificial light produced by such a massive industrial operation located within the waters of the Lydia Ann Channel and active 24 hours a day will adversely affect both nesting and hatchling sea turtles, resulting in injury and death to individual sea turtles in direct violation of Section 9 of the ESA.

99.     Piping plover Critical Habitat Units TX-15 and TX-16 are located on San Jose Island, adjacent to the barge facility.  Both of these critical habitat units are known to be occupied by the federally-listed piping plover.

100.    The USACE's authorization of the industrial barge facility, and the resulting discharge of oil, gas, and raw sewage into sensitive estuarine and coastal habitats, poses a significant risk of injury and death to individual piping plover in direct violation of Section 9 of the ESA.

101.    The Aransas-Wood Buffalo whooping crane flock is the only natural wild flock of whooping cranes remaining in the world.

102.    The current population of the Aransas-Wood Buffalo flock is currently estimated to be only 310 individuals.

103.    This flock winters in the Aransas National Wildlife Refuge and nearby areas in Aransas County, Texas, including San Jose Island, which is immediately adjacent to the barge facility and the petrochemicals and hazardous materials stored there.

104.    Whooping cranes have been documented in the vicinity of San Jose Island for the last five years. Indeed, a family unit (two adult whooping cranes with a juvenile whooping crane)

was photographed earlier this year, in the area immediately adjacent to the barge facility during its construction, but before it became operational.

105. The USACE's authorization of this facility, and the resulting activities and work associated with its operation are substantial and pose a direct threat of harm, injury and death to individual whooping cranes in direct violation of Section 9 of the ESA.

106. Constant, significant noise from engines and generators cause considerable disturbance to whooping cranes and other species.

107. Significant and ongoing human activity resulting from tugboats moving large industrial barges around the facility and the repositioning of barges within the facility causes additional disturbance to whooping cranes and other species.

108. In addition, the constant presence of a construction crane within the facility, as well as the extremely tall towers on the tugboats, in the immediate proximity of a known whooping crane foraging area cause a substantial likelihood of a collision resulting in injury or death to individual whooping cranes.

109. According to LAC Moorings' own "LAC Fleet" website, its barge fleeting facility constantly contains barges loaded with petroleum products, hazardous substances, and dangerous cargo.

110. In spite of this fact, the USACE never required LAC Moorings to develop either a chemical spill response plan or an oil spill response plan for review by the Resource Agencies, contrary to repeated recommendations to do so.

111. It is irresponsible, reckless, and unlawful for the USACE to ignore a recommendation for an applicant to create a chemical response plan and an oil spill response plan.

112.    The sheer magnitude of LAC Moorings' ongoing operations in connection with its barge fleeting facility are such that illegal take of multiple listed species in the Lydia Ann Channel in direct violation of Section 9 of the ESA is virtually certain.

113.    The USACE specifically authorized the construction and operation of this project. As such, the USACE's action violates the ESA.

**F.     USACE's authorization of the barge facility violates the Endangered Species Act.**

114.    The Corps' approval of the construction and operation of LAC Moorings' barge facility constitutes an "action" subject to the ESA.

115.    The USACE made its "no effect" determination blindly and without utilizing any scientific data whatsoever, in clear violation of Section 7(a)(2) of the ESA.

116.    The USACE failed to comply with the requirements of Section 7 of the ESA. The USACE apparently only considered the immediate locations where the individual mooring "dolphins" were to be installed into the sea bed as the "action area."   In addition, the UASCE appears to have only considered the effects of the installation of the individual mooring "dolphins" as the "effects" of the proposed action.

117.    The USACE attempted to narrowly focus its review of the "effects" of its action, and by doing so disregarded and failed to consider the direct and indirect impacts of the construction and operation of the barge fleeting facility, as well as the effects of the other activities that are related and dependent on the building and operation of that facility. By artificially narrowing its focus of review in this manner the USACE completely ignored impacts to federally-listed species and wholly ignored the legal requirement under Section 7 of the ESA to consult with both the USFWS and the NMFS.

118.     The USACE was clearly put on notice by the TPWD that there were federally-listed sea turtles in the proposed project area.  In addition, even the most basic review of available scientific information would have made it obvious to the USACE that other federally-listed species, specifically whooping cranes, piping plover, and rufa red knot were also in the action area of the proposed project.

119.     Under section 7 of the ESA, the USACE should have initiated consultation with the USFWS for adverse effects to whooping cranes, piping plover, and rufa red knot, and initiated consultation under section 7 of the ESA with both the USFWS and NMFS for adverse effects to Atlantic hawksbill sea turtles, green sea turtles,  Kemp's ridley sea turtles, leatherback sea turtles, and loggerhead sea turtles.

120.     The USACE violated section 7 of the ESA by its completely arbitrary and capricious (and blatantly incorrect) determination that the construction and operation of the proposed one and a half mile long barge fleeting facility somehow would have "no effect" on listed endangered species.

121.     The effects resulting from the USACE's authorization of the construction and operation of the barge fleeting facility are substantial and pose a direct threat of harm, injury and death to federally-listed endangered species in violation of Section 9 or the ESA.

### G.     USACE authorized the barge facility despite LAC Moorings' failure to assess and protect cultural resources.

122.     On June 10, 2014, the USACE notified LAC Moorings by letter that "there are three recorded cultural resources (41AS88, 41AS91, and the Aransas Pass Light Station) adjacent to the proposed project." The USACE further notified LAC Moorings that "[y]ou will need to assess the eligibility for these resources to be included in the National Register of Historic Places and do an assessment of potential effects to the resources from the proposed

project."  LAC Moorings did no such assessment, but the USACE authorized the barge facility anyway.

123.   LAC Moorings and the USACE failed to assess the eligibility for these three recorded cultural resources to be included in the National Register of Historic Places, although the Aransas Pass Light Station is currently listed on the National Register of Historic Places.

124.   LAC Moorings and the USACE failed to prepare an assessment of potential effects to these cultural and historic resources.  In fact, the USACE failed to conduct any analysis whatsoever of the effects of barge facility on these cultural and historic resources prior to their issuance of the Letter of Permission, in violation of Section 106 of the National Historic Preservation Act and the USACE Regulations.

125.   The construction and operation of the industrial barge facility is causing significant adverse impacts to the recorded historic shipwreck of the *John Worthington* (Texas archeological site number 41AS88).  Barges and tugboats consistently run directly over the top of this submerged archeological resource on their way to and from the unpermitted, two-story "headquarters building," scouring the seabed, creating turbidity and causing damage to the historical site.

126.   Likewise, the construction and operation of the barge facility is causing significant adverse impacts to the Aransas Pass Light Station, which was listed in the National Register of Historic Places in 1977. This hulking, industrial barge fleeting area looms just over a quarter mile from the historic lighthouse. The once scenic view from the lighthouse, and of the lighthouse and the undeveloped expanse of San Jose Island has been replaced by over a mile and a half of chemical barges and tugboats which destroy the historic value of this unique setting.

**H.**     **The USACE rushes approval of the barge facility despite agency concerns over its threats to navigation and safety.**

127.     On November 3, 2014, the USACE Operations Division, Navigation Branch notified the USACE Regulatory Division that "Ops has concerns that the proposed fleeting facility may pose a hazard to navigation given the location *is in a bend of the GIWW and in a high-traffic area*." (emphasis added).

128.     LAC Moorings failed to provide coordinates to the USACE for the 82 proposed pilings in the commercial industrial barge fleeting, storage, and service facility until December 8, 2014.

129.     On December 8, 2014, USACE Regulatory staff forwarded the coordinates for the 82 proposed "pilings" to the USACE Operations Division, Navigation Branch and stated via email "Regulatory is prepared to issue a Letter of Permission unless Ops/Nav determines it is a 408 issue. Please let us know as soon as possible so we can communicate the concerns with *Mr. Mike Skipper Edwards (applicant)*." (emphasis added).

130.     On December 11, 2014 the USACE Operations Division, Navigation Branch again raised significant concerns regarding safety and hazards to navigation associated with the LAC Moorings' permit application. Operations Division, Navigation Branch staff wrote: "Operations is concerned with the present location of the proposed fleeting facility. Specifically it is located at a bend in a high traffic section of the channel that is influenced by sea conditions due to its proximity to the CCSC [Corpus Christi Ship Channel]. Currently there is no set-back policy developed / applied for the Lydia Ann channel. We are working with the folks here to apply the set-back requirement to the Lydia Ann as it is the route used by the vast majority of channel traffic. The other issue is that we are also proposing to re-align the land-locked section of the Lydia Ann channel to follow the naturally deep water portion of the channel."

131.    On December 15, 2014, USACE Regulatory Division staff notified USACE Operations Division, Navigation Branch staff as follows: "I understand and will hold off on finalizing at least until after the holidays. In light of the fact that this *applicant is expecting a decision*, I would ask that you remain engaged and keep the effort moving forward so that *I can keep the applicant informed*." (emphasis added).

132.    On December 19, 2014, USACE Operations Division, Navigation Branch staff emailed USACE Regulatory Division staff and stated: "We should have everything coordinated and be ready to meet with the applicant if necessary second week of January."

133.    In spite of this, on December 29, 2014, USACE Corpus Christi Regulatory Field Office staff emailed Defendant McLaughlin and informed her that: "We … just got off the phone with **Mike "Skipper" Edwards** and informed him that we contacted [USACE Operations Division staff] and they would likely be out till next week. But if he wanted to he [sic] contact Joe, as they know each other. Mike stated that he did not want to "muddy the water" and would wait until they returned next week. … I informed [Mike] of our conversation that Regulatory is prepared to make a decision next week and if necessary you [Defendant McLaughlin] would sign. … Mike informed us that he will wait till next week *before going up the chain of command.* Hopefully Nav/Ops will make a decision; *regardless, we will be prepared to make our decision next week*." (emphasis added).

134.    On January 12, 2015, Defendant McLaughlin emailed the USACE Operations Division, Navigation Branch staff and stated: "We need to move out on this. Please provide a response ASAP otherwise we will make a permit decision next week."

135.    On January 12, 2015, USACE Operations Division, Navigation Branch staff responded to Defendant McLaughlin that: "We have requested hydrographic survey data from

the [USACE] Corpus Christi Resident Office. **We can't make our determination without that data**." (emphasis added).

136.     On January 13, 2015 the U.S. Coast Guard Waterways Management Division Chief for CG Sector Corpus Christi emailed USACE Operation Division, Navigation Branch staff and stated: "I appreciate your assistance this morning and would greatly appreciate any info you can provide on the Lydia Ann fleeting area. Thank you."

137.     On January 13, 2015, USACE Operation Division, Navigation Branch staff replied to the U.S. Coast Guard Waterways Management Division Chief for CG Sector Corpus Christi as follows: "Sir, glad to assist you any way we can. Attached are the kmz Google files for both the Lydia-Ann side channel and the proposed fleeting facility. I also put together a quick image showing approximate locations of Lydia-Ann channel and the facility. I'll send the set-back policy in separate email. … If Sector Corpus Christi has any concerns or objections with the facility as proposed please send a letter stating so to the [USACE] regulatory project manager in Corpus…" USACE Regulatory Division staff was copied on this email message.

138.     Two days later, on January 15, 2015, over the objections of the USACE Operations Division, Navigation Branch and before the Coast Guard could weigh in, Defendant McLaughlin signed and issued the Letter of Permission on behalf of the USACE District commander.

139.     The USACE's Regulatory Division's action to sign and issue the Letter of Permission over the objections of the USACE Operations Division, Navigation Branch and before the Coast Guard could weigh in were not only arbitrary and capricious, they were unreasonable, grossly irresponsible, unlawful, and created a danger to human health, safety and the environment.

I.      **The USACE has refused to revisit its approval despite the obvious fact that the current barge facility is much different from what USACE authorized.**

140.    It is now evident that LAC Moorings built a facility that is very different from the design that was portrayed to USACE.  LAC Moorings significantly changed the design for the mooring dolphins in the barge fleeting facility.   What has been installed is not what was disclosed to the Resource Agencies or approved by the USACE. The "PERMITTED PLANS" attached to the Letter of Permission include the same emailed photo of a crude hand-drawn rendering that LAC Moorings had submitted as its "design proposal" with its Permit Application. It shows a single 24" Steel Pipe monopole design for each mooring dolphin.  That is not what LAC Moorings built.  LAC Moorings unilaterally changed this design just days before the Letter of Permission was issued and proceeded to install much larger, 3-pile tripod mooring structures consisting of one 32" steel pile together with two 12" steel piles projecting outward at 45 degree angles back towards seagrass areas and the shoreline habitat.  In addition, these structures were coated with coal tar epoxy, which was never disclosed to the Resource Agencies, posing additional adverse impacts to federally-listed endangered species and environmentally sensitive features.

141.    In addition, the barge fleeting facility contains numerous unpermitted and unauthorized structures that were never disclosed to the USACE or to the Resource Agencies. These structures include a two-story "operations headquarters" constructed upon two platforms which are permanently affixed to the seabed using numerous unpermitted pilings.   Trash dumpsters, potable water tanks, a picnic area, port-a-potties, portable sanitation facilities, exercise equipment, washing machines, and other equipment have been placed on these two platforms in addition to the two-story "operations headquarters" building. This "operations

headquarters" is fully manned 24 hours a day, seven days a week.  The USACE has visited the operational barge fleeting facility, but has not required LAC Moorings to remove any of the unpermitted and unauthorized structures. The change in the structures that ware actually built from the proposed design contained in the application, as well as the various unpermitted structures, constitute significant changes and revisions to the permit application, and should, at a minimum, require a new permit procedure.

## VI.    CAUSES OF ACTION

### COUNT I: The USACE Issued a Letter of Permission to LAC Moorings in Violation of NEPA, the NEPA Regulations and USACE's Own Regulations

142.    Plaintiff incorporates by reference the foregoing paragraphs into Count I as if fully set out herein.

143.    The USACE regulations provide that Letters of Permission may be used as an alternate permitting procedure only if, in the opinion of the district engineer, the proposed work (i) would be minor, (ii) would not have significant individual or cumulative impacts on environmental values, and (iii) should encounter no appreciable opposition. 33 CFR 325.2(e)(1)(i).

144.    The USACE's own criteria for use of a Letter of Permission was not met in this case because:

(i)    The proposed barge fleeting facility could not reasonably have been considered to be "minor" work - it covered an area of approximately 86 acres, extended over a mile and a half along and directly adjacent to an undeveloped barrier island, and was designed to accommodate hundreds of barges.

(ii)    The proposed barge facility could not reasonably have been determined to have only an insignificant impact on environmental values - it has and continues to (i) pollute the

water in and around the area of the barge facility, (ii) discharge wastewater, trash, and other debris from tugboats parked in the facility, (iii) adversely impact the Aransas Pass Lighthouse and John Worthington shipwreck, (iv) adversely impact listed endangered species and their habitat, (v) adversely impact air quality by the constant release of hazardous gasses from barges stored within the facility, (vi) adversely impact the recreational opportunities along San Jose island on the east side of Lydia Ann Channel, and (vii) present a hazard to navigation along the Gulf Intracoastal Waterway.

(iii)     The USACE knew or should have known, from the inception of the permit process, that there would be, and should be, appreciable opposition to the project.

145.    Based on the criteria for a Letter of Permission contained in USACE's own regulations, a Letter of Permission was not appropriate, suitable, or authorized for this proposed project. The action of the USACE in issuing the "Permit Number SWG-2014-00460; Letter of Permission" dated January 15, 2015, was not reasonable and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside. Plaintiff is entitled to bring causes of action under NEPA, applicable regulations and the APA, 5 USCA §§ 702 and 706.  Plaintiff asks this Court to hold and declare unlawful and set aside the Letter of Permission, Permit Number SWG-2014-004610.

***COUNT II: The USACE's Authorization of the Construction of a Mile and a
Half Long Industrial Barge Fleeting Facility in the Lydia Ann Channel
Without First Completing an Environmental Survey or Providing Public
Comment Violated NEPA, the NEPA Regulations and USACE's Own
Regulations.***

146.    Plaintiff incorporates by reference the foregoing paragraphs into Count II as if
fully set out herein.

147.    The USACE regulations implementing NEPA govern the USACE's review and
issuance of permits. 33 CFR §325.2(a)(4) provides that a decision on a permit application will
require either an Environmental Assessment or an Environmental Impact Statement "unless it is
included within a categorical exclusion." As detailed above, this project did not qualify for a
Letter of Permission, and does not properly or legally fall within a categorical exclusion. There
was no environmental assessment or environmental impact statement prepared by the USACE on
the application for the construction and operation of barge fleeting facility.

148.    The USACE regulations also require the USACE to provide public notice of all
permit applications and to consider all resulting public comment.  33 C.R.R. § 325.2(a)(3) and §
325.3.  The USACE failed to provide this public notice which is critical to the mandatory
procedure for evaluating permit applications under NEPA, the NEPA regulations and the
USACE's own regulations.

149.    The action of the USACE in authorizing the LAC Moorings' fleeting facility
without providing the public with notice and opportunity to comment and be heard and without
conducting an Environmental Assessment or an Environmental Impact Statement was
unreasonable and was also arbitrary, capricious, an abuse of discretion and otherwise not in
accordance with law, and should be set aside.  Failure of the USACE to provide public notice
and an opportunity for public comment and to conduct a proper Environmental Assessment or an
Environmental Impact Statement prior to authorizing LAC Moorings' barge facility was

unlawful and unreasonable.  Plaintiff has no other adequate remedy and may bring causes of action under NEPA, the NEPA regulations, the USACE regulations and the APA, 5 USCA §§ 702 and 706.  Plaintiff asks this Court to hold and declare unlawful and set aside the action of USACE in authorizing the construction and operation of LAC Moorings' barge facility.

### COUNT III: The USACE Violated NEPA, the NEPA Regulations and Its Own Regulations in Failing to Revoke the Letter of Permission and/or Requiring LAC Moorings to Submit a New Permit for the Barge Fleeting Facility as Constructed.

150.    Plaintiff incorporates by reference the foregoing paragraphs into Count III as if fully set out herein.

151.    USACE's Letter of Permission to LAC Moorings requires that "All work is to be performed in accordance with the enclosed plans in 8 sheets and the permit conditions." LAC Moorings proposed, and USACE authorized, a single 24" Steel Pipe monopole design for the 82 individual mooring dolphins. What has in fact been installed is not what was disclosed to the Resource Agencies or approved by USACE.  LAC Moorings apparently changed the design just days before the Letter of Permission was issued and has unilaterally installed much larger, 3-pile "tripod" mooring structures consisting of a 32" steel pile together with two 12" steel piles projecting outward at 45 degree angles back towards sea grasses and the shoreline habitat.  In addition, these structures were coated with coal tar epoxy, which was never disclosed to the Resource Agencies.

152.    Based upon information and belief, these unpermitted individual mooring dolphins have been installed in locations other than those identified in the 8 sheets of "PERMITTED PLANS" attached to the Letter of Permission.

153.    In addition, the industrial barge fleeting facility contains numerous unpermitted and unauthorized structures. These structures include a two-story "operations headquarters"

which is fully manned 24 hours a day, seven days a week, and various other structures.  The USACE has visited the barge fleeting facility, and has not required the LAC Moorings to remove any of the unpermitted and unauthorized structures. The change in the structures that ware actually built from the proposed design contained in the application, as well as the various unpermitted structures which were installed, constitute significant changes and revisions to the permit application, and should, at a minimum, require a new permit procedure.

154.    33 C.F.R. § 325.7 allows the USACE to initiate action to modify, suspend, or revoke a permit as may be made necessary by considerations of the public interest.  The factors to be considered by the USACE include (i) the extent of the permittee's compliance with the terms and conditions of the permit, (ii) whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and (iii) any significant objections to the authorized activity which were not earlier considered.

155.    Section 325.7 of the USACE regulations provides that

Significant increases in scope of a permitted activity *will* be processed as new applications for permits in accordance with § 325.2 of this part, and not as modifications under this section.

83 C.F.R. § 325.7(a) (emphasis added).

156.    USACE has been informed of the significant discrepancies between the facility approved in the Letter of Permission and the facility as built and operated by LAC Moorings. USACE's failure to initiate action to revoke the Letter of Permission and/or to require LAC Moorings to file a new permit application under 33 CFR § 325.2 violates NEPA and applicable regulations, is unreasonable, and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  Plaintiff is entitled to assert a cause of action under USACE's regulations and under the APA, 5 U.S.C.A. §§ 702 and 706.  Plaintiff asks this Court to hold and

declare unlawful the USACE's failure to revoke the Letter of Permission and its failure to require LAC Moorings to file a new permit application for the facility actually constructed. Plaintiff further asks the Court to compel the USACE to comply with its legal obligations by revoking the Letter of Permission, Permit No. SWG-2014-00460, and by requiring LAC Moorings to submit a new permit application for the barge facility as constructed and operated.

### Count IV: The USACE Violated Section 7 of the ESA By Failing to Consider Or Base Decisions Upon Scientific Data, and By Failing to Consult With USFWS About Impacts to Known Endangered Species.

157.    Plaintiff incorporates by reference the foregoing paragraphs into Count IV as if fully set out herein.

158.    Section 7(a)(1) of the ESA makes clear that all Federal agencies shall "utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to … this Act."

159.    Section 7(a)(2) of the ESA provides that the USACE shall "... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species... ."

160.    The USACE's approval of the construction and operation of the commercial barge fleeting and storage facility by issuing a Letter of Permission constituted an "action" subject to the ESA.

161.    The USACE failed to comply with Section 7(a)(2) because it failed to base its "no effect" determination on the best scientific and commercial data available, and instead made its "no effect" determination blindly and without utilizing any scientific data whatsoever.

162.    The USACE failed to fully consider and evaluate all the "effects of the action" which include both the "direct" and "indirect effects" of authorizing the construction of the commercial barge fleeting, storage, and service facility in violation of Section 7 of the ESA.

163.    The USACE failed to fully consider and evaluate all the "effects of the action" which include both the "direct" and "indirect effects" as well as "the effects of other activities that are interrelated or interdependent with that action," that would result from authorizing the construction of the commercial barge fleeting and storage facility in violation of Section 7 of the ESA.

164.    Although it is clear that the  USACE was notified that there were federally-listed sea turtles in the proposed project area and should have known were whooping cranes, piping plover, and rufa red knot, were also present, the USACE failed to initiate proper consultation with the USFWS under Section 7 of the ESA regarding adverse effects to whooping cranes, piping plover, and rufa red knot, and failed to initiate consultation under Section 7 of the ESA with both the USFWS and NMFS for adverse effects to Atlantic hawksbill sea turtles, green sea turtles,  Kemp's ridley sea turtles, leatherback sea turtles, and loggerhead sea turtles, in direct violation of Section 7 of the ESA.

165.    The USACE violated Section 7 of the ESA by arbitrarily and capriciously determining that the construction and operation of the proposed commercial industrial barge fleeting, storage, and service facility would have "no effect" on listed endangered species. Plaintiff is entitled to assert a cause of action for relief pursuant to the citizen suit provision of the ESA, 16 U.S.C.A. § 1540(1).  Plaintiff asks this Court to hold and declare unlawful the USACE's failure to consider and base decisions upon scientific data, and its failure to consult with USFWS prior to issuing the Letter of Permission.  Plaintiff asks this Court to enjoin

USACE from its ongoing violation of federal law.  Plaintiff further asks this Court to issue a mandatory injunction compelling USACE to revoke the Letter of Permission and to consider and act upon any similar permit applications (by LAC Moorings or otherwise) only in compliance with legal requirements, including Section 7 of the ESA.

### Count V: Defendants Authorized Activities that are Reasonably Certain to Cause the Take of Federally-Listed Endangered Species in violation of Section 9 of the ESA

166.    Plaintiff incorporates by reference the foregoing paragraphs into Count V as if fully set out herein.

167.    Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). "'Take' is defined in ... the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2995. Taking includes the concepts of "harm" and "harassment." 16 U.S.C. § 1532(19). Harm may occur through significant habitat modification that actually kills or injures a protected species by impairing essential behavior patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3. Harassment may occur through an act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns such as breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

168.    All Defendants are persons subject to the ESA take provision, 16 U.S.C. § 1538(a), and subject to the ESA citizen suit provision, 16 U.S.C. § 1540(g).

169.    The USACE's review and approval of the Letter of Permission authorizing the construction and operation of the commercial barge fleeting, storage, and service facility already have likely resulted in the illegal take of federally-listed endangered species, and are virtually certain in the future to cause additional takes, all in violation of the ESA.

170.     To stop the on-going violation of federal law, Plaintiff seeks a judicial declaration of the USACE's obligations under the ESA pursuant to 28 U.S.C. § 2201 & 2202, and additional relief under the ESA citizen suit provision, 16 U.S.C.A. § 1540(g)(1).   Specifically, Plaintiff seeks (i) a declaration that the USACE has failed to comply with the requirements of the ESA, (ii) injunctive relief to require the USACE to revoke the Letter of Permission, and (iii) injunctive relief to require the USACE to comply with the ESA in connection with any further permit applications impacting the Lydia Ann Channel and the surrounding areas, whether those permit applications are submitted by LAC Moorings or others.

### *Count VI: Future Takes of Federally-Listed Endangered Species are Reasonably Foreseeable and Must be Enjoined Under the ESA*

171.     Plaintiff incorporates by reference the foregoing paragraphs into Count VI as if fully set out herein.

172.     The USACE's failures, oversights and deficiencies in the review and approval of the commercial barge fleeting, storage, and service facility by issuance of a Letter of Permission failed to avoid prohibited takes of federally-listed endangered species, and they are highly likely to cause future takes.

173.     It is reasonably foreseeable that the future use and operation the commercial barge fleeting and storage facility, as well as numerous unpermitted and unauthorized structures will result in additional prohibited takes of federally-listed endangered species unless the USACE's continued authorization of such activities are enjoined.

174.     The construction, use, and operation the commercial barge fleeting and storage facility authorized by Defendants, as well as the use and operation of numerous unpermitted and unauthorized structures are so likely to result in prohibited takes of federally-listed endangered

species that the USACE's continued authorization of these structures and operations must be enjoined under the ESA.

175.    Unless enjoined by the Court, the USACE will continue taking federally-listed endangered species in violation of Section 9 of the ESA, 16 U.S.C. § 1538, by allowing the LAC Moorings to continue to operate the commercial barge fleeting and storage facility, as well as numerous unpermitted and unauthorized structures.  Plaintiff is entitled to bring this action under the ESA citizen suit provision, 16 U.S.C.A. § 1540(g), to enjoin the USACE as set forth herein. Specifically, Plaintiff seeks an injunction to enjoin USACE from (i) allowing LAC Moorings to operate the barge facility; (ii) allowing LAC Moorings to operate any unpermitted structures in the Lydia Ann Channel; or (iii) allowing any activities in Lydia Ann Channel that are likely to result in takes of federally-listed endangered species.

## VIII. PRAYER

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A.    Declare that the USACE's issuance of "Permit Number SWG-2014-00460; Letter of Permission" dated January 15, 2015, violated the APA, NEPA, the ESA, and the NEPA and ESA implementing regulations;

B.    Declare that the USACE violated Section 7 of the ESA, 16 U.S.C. § 1536, by artificially narrowing the "action area" and its focus of review, ignoring impacts to federally-listed species, and ignoring the legal requirement under Section 7 of the ESA to consult with both the USFWS and the NMFS;

C.    Declare the "Permit Number SWG-2014-00460; Letter of Permission" dated January 15, 2015, issued by the USACE to Lydia Ann Channel Moorings, LLC, to be null and void, and of no effect;

D.      Require the USACE to revoke "Permit Number SWG-2014-00460; Letter of Permission" dated January 15, 2015, issued by the USACE to Lydia Ann Channel Moorings, LLC;

E.      Enjoin the USACE from allowing LAC Moorings or any other individual or entity from using any of the unpermitted, unauthorized mooring dolphins, two-story headquarters structure, or any other structures in the area for any reason whatsoever unless and until the USACE has issued a permit required by Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act in compliance with NEPA, the ESA, and other federal laws;

F.      Declare that the USACE and the individual defendant officials of the USACE must comply with the requirements of NEPA, the CEQ regulations, the USACE regulations implementing NEPA, the USACE permitting regulations, and the ESA as a condition for the review and processing of any new permit for the construction or operation of commercial industrial barge fleeting, storage, and service facility in Lydia Ann Channel;

G.      Issue a mandatory injunction requiring the USACE and the individual defendant officials of the USACE to prepare environmental documentation in accordance with NEPA, the CEQ regulations, the USACE regulations, the USACE permitting requirements, and the ESA with respect to assessing the potential environmental effects of LAC Moorings' existing barge fleeting facility in the Lydia Ann Channel or any modifications of that facility;

H.      Declare that the USACE may not consider any investment made in construction of the unpermitted and unauthorized mooring dolphins, two-story

headquarters, and any other structure associated with the barge fleeting facility in Lydia Ann Channel in any subsequent analysis of reasonable alternatives under NEPA;

I.     Awarding plaintiff, Friends of Lydia Ann Channel, its costs of litigation, including but not limited to, attorneys' fees, consultants' and expert witness fees, and costs, as authorized by 28 U.S.C. §2412, and by the ESA, 16 U.S.C. § 1540(g)(4);

J.     Award such other relief as this Court deems just and appropriate; and

K.     Retain jurisdiction over this matter until such time as Defendants have come into compliance with the requirements of NEPA, the ESA, the APA, and all other state and federal laws and have fully complied with any remedial orders of this Court.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY

By:  /s/ G. Douglas Kilday
        G. Douglas Kilday
        Attorney-in-Charge
        SBN 00787834
        SDTBN 20679
        dkilday@gdhm.com
        David P. Smith
        SBN 00788435
        SDTBN 2771363
        dsmith@gdhm.com
        401 Congress Avenue, Suite 2200
        Austin, Texas 78701
        512-480-5600
        512-478-1976 (*fax*)

***Counsel for Plaintiff Friends of Lydia Ann Channel***