United States District Court
Southern District of Texas
**ENTERED**
March 13, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FRIENDS OF LYDIA ANN CHANNEL, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 2:15-CV-0514 |
| U.S. ARMY CORPS OF ENGINEERS, and | § § § | |
| LT. GEN. TODD T. SEMONITE, in his official capacity, Commanding General and Chief of Engineers, U.S. Army Corps of Engineers, and | § § § § § | |
| COL. LARS N. ZETTERSTROM, in his official capacity, District Engineer and Commanding Officer, Galveston District, U.S. Army Corps of Engineers, and | § § § § § | |
| KIM MCLAUGHLIN, in her official capacity, Chief Regulatory Division, Galveston District, U.S. Army Corps of Engineers, | § § § § | |
| *Defendants*, | § § | |
| v. | § § | |
| LYDIA ANN CHANNEL MOORINGS, LLC, *Intervenor*. | § § § § § | |

## <u>ORDER GRANTING PRELIMINARY INJUNCTION</u>

On November 15, 2016, the Court held a hearing on Friends of Lydia Ann Channel's ("Plaintiff") request for a preliminary injunction against Lydia Ann Channel Moorings, LLC ("LACM"). (D.E. 64). For the reasons stated herein, Plaintiff's request for a preliminary injunction is **GRANTED**.

## I.      JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346 because the claims are brought against federal defendants and arise under the laws of the United States:   16 U.S.C. § 1531 *et seq.* (the Endangered Species Act), 5 U.S.C. § 701 *et seq.* (the Administrative Procedure Act), and 42 U.S.C. § 4321 *et seq.* (the National Environmental Policy Act).   Venue is proper in this Court because the alleged violations occurred in the Southern District of Texas and a substantial part of the federal agency actions and omissions giving rise to the claims occurred in this district.

## II.     PROCEDURAL BACKGROUND

On December 23, 2015, Plaintiff filed its Original Complaint against the United States Army Corps of Engineers and three named employees (collectively "Federal Defendants") seeking injunctive and declaratory relief for violations of the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA").   (D.E. 1). On March 7, 2016, Federal Defendants filed their Answer (D.E. 27) and on March 15, 2016, Federal Defendants filed a partial administrative record (D.E. 29).   On April 22, 2016, LACM was allowed to intervene.   (D.E. 47).   On July 7, 2016, Federal Defendants filed a supplemental administrative record which contained a partially redacted document.   (D.E. 56).   On July 12, 2016, Federal Defendants filed a correction to the administrative record containing the un-redacted document.   (D.E. 58).

On September 30, 2016, Plaintiff filed its First Amended Complaint seeking injunctive and declaratory relief from Federal Defendants and LACM.   (D.E. 64). Plaintiff's Amended Complaint also contained a request for a preliminary injunction to

restrain LACM from continuing to operate its barge fleeting facility and from using the unauthorized mooring structures. (D.E. 64, Page 69). On October 14, 2016, LACM filed a Motion to Dismiss the Amended Complaint (D.E. 66) which this Court denied on November 22, 2016. (D.E. 119). Also on October 14, 2016, Federal Defendants filed their Response to Plaintiff's Request for Preliminary Injunction. (D.E. 69). On November 15, 2016, LACM filed their Response to Plaintiff's Request for Preliminary Injunction (D.E. 104) and a hearing was held addressing Plaintiff's request for a preliminary injunction. At the hearing, Federal Defendants did not oppose the issuance of a preliminary injunction against LACM. (D.E. 122, Page 33 Lines 20-21). To the extent not previously ruled on or admitted at the hearing, the Court finds that the entire administrative record applicable to the merits of Plaintiff's claims against Federal Defendants and LACM is admissible under the standards of *Davis Mountains Trans-Pecos Heritage Ass'n v. U.S. Air Force*. 249 F.Supp.2d 763, 776 (N.D. Tex. 2003).

## III.    FACTUAL BACKGROUND

### A.    Application Process

On June 10, 2014,[1] the United States Army Corps of Engineers ("USACE") received an application from LACM to build approximately 82 individual mooring dolphins[2] with each mooring to be one hundred (100) feet apart in waters of no less than

---

[1] The United States Army Corps of Engineers' tracking sheet shows the application as being received on June 3, 2014 and a Joint Evaluation Meeting occurred on that date. (USACE Administrative Record ("AR") 1 and 6). However, the actual application shows the date received as June 10, 2014. (AR 8).

[2] Mooring dolphins are structures that are used for mooring only and to secure vessels using ropes. *See* Vincent T.H. Chu, A Closer Look at Prevailing Civil Engineering Practice, What,

twelve (12) feet deep.  (USACE Administrative Record ("AR") 8-9).  The site location described was the east side of the Lydia Ann Channel directly across from the Aransas Pass Light House.  (AR 9).  The Texas General Land Office ("TXGLO") granted LACM a twenty-year lease for this property on September 23, 2014.  (AR 53)  The proposed purpose of the project was to:

> [P]rovide temporary mooring for barges and tugs inside Lydia Ann Channel
> (Fleeting).  To provide a Coast Guard [a]pproved security plan for area.  To
> provide a[n] Oil Spill Response Program for area.  To provide 24 hour on
> site security and tug assist for moorings of such barges.  To provide above
> area as alternative to barges that are presently grounding in area on shore
> and damaging shoreline, sea grass, etc.

(AR 9).  The application was submitted and signed by Christopher Pietsch ("Pietsch") as the applicant and Robert Bryan Gulley ("Gulley") as an authorized agent.  (AR 8-10).  On the application, both officials listed Mike Edwards's ("Edwards") email address and Pietsch also listed Edwards's phone number.  (AR 6 and 8).  According to LACM, Edwards[3] is Pietsch's father in law and has no experience of any kind with any type of mooring project or with the USACE.  (D.E. 122, Page 231 Line 23-Page 232 Line 6).  However, email correspondence shows Edwards had a pre-existing relationship with someone named Joe who works for USACE.  (AR 87) (email dated December 29, 2014: "[b]ut if he wanted to he [could] contact Joe, as they know each other").  Additionally,

---

Why and How? (2010).  Generally, mooring dolphins are rigid structures composed of pilings and often times vertical poles which bear the load.  *See* Gregory P. Tsinker, Port Engineering: Planning, Construction, Maintenance, and Security (2004).
[3] Edwards's real name is Everett Michael Skipper but he uses the name he acquired as a radio disc jockey: Mike Edwards.  (D.E. 122, Page 231 Lines 1-5).

prior to the application at issue, Edwards was convicted of bribing a public official in order to obtain permits.  (D.E. 122, Page 232 Lines 7-12).

Throughout the application review process, USACE employees had consistent contact with Edwards.   Edwards and USACE personnel in Corpus Christi routinely shared email messages which included personal conversations and exchanges of pictures of the two-story headquarters built by LACM.  (AR 384, 383, 386, 505 and 585).  In late December 2014, based on conversations with Edwards, USACE began pressuring their operations division to make a decision.  (AR 87-91).

### B.    Issuance of the Letter of Permission

On January 15, 2015, USACE authorized a letter of permission[4] approving LACM's application.  (AR 98-106).  USACE determined the proposed work would be minor, not have significant impacts on environmental values, and should encounter no appreciable opposition.  (AR 99).  Accordingly, USACE determined public notice was not required.  (AR 99).  The letter of permission listed the agencies that commented including the US Fish and Wildlife Service, the National Marine Fisheries Service, the Texas Parks and Wildlife Department, and the State Historic Preservation Office.  (AR 99).  It also contained LACM's response to agency comments and stated USACE

---

[4] "Letters of permission are a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and state fish and wildlife agencies . . . and a public interest evaluation, but without the publishing of an individual public notice."  33 C.F.R. § 325.2(e)(1).  Letters of permission may be used "when, in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition."  *Id*. § 325.2(e)(1)(i).

considered the concerns adequately addressed based on the representations of the project given by LACM.  (AR 100).

USACE also determined that the project would not impede navigation through the Lydia Ann Channel, basing its findings on the fact the project is designed to moor no more than four barges at a time.  (AR 100).  The letter of permission acknowledged the presence of numerous endangered or threatened species.[5]  (AR 103).  USACE determined the project would have a minimal impact on these species and their critical habitat due to the project's limited size, duration, and scope.  (AR 103).  However, there is no evidence of any impact studies contained in the administrative record.

### C.    Revocation of the Letter of Permission

On March 23, 2016, USACE suspended LACM's letter of permission.  (D.E. 32-1).  Based on a February 8, 2016 site visit, USACE concluded the pilings were not where they were proposed to be placed and the pilings differed from the ones that were permitted.  (D.E. 32-1, Page 2).  USACE found there was a need to review the non-conforming pilings effects on navigation and to consider new information about the project's purpose.  (D.E. 32-1, Page 2).

On September 12, 2016, USACE revoked LACM's letter of permission.  (D.E. 61-1).  USACE began receiving complaints that LACM was not adhering to the terms of the letter of permission and based on subsequent investigation, determined LACM's stated

---

[5] The letter of permission acknowledged the presence of the following species: Whooping Crane, Brown Pelican, Arctic Peregrine Falcon, Northern Aplomado Falcon, Mountain Plover, Piping Plover, Slender Rush-Pea, West Indian Manatee, Gulf Coast Jaguarondi, Ocelot, American Black Bear, Hawksbill Sea Turtle, Leatherback Sea Turtle, Kemp's Ridley Sea Turtle, Green Sea Turtle, and Loggerhead Sea Turtle.  (AR 103).

purpose did not accurately describe the scope or the need for the operation.  (D.E. 61-1, Page 2).  USACE informed LACM the mooring dolphins constructed were no longer authorized and must be removed.  (D.E. 61-1, Page 2).  USACE stated it intended to conduct a public interest review and alternatives analysis to evaluate LACM's removal and restoration plan and asked LACM to submit their preferred removal and restoration method along with alternatives analysis of all available methods for removal.  (D.E. 61-1, Page 2).  USACE also requested LACM provide the previously requested threatened and endangered species survey, surveys of seagrass and oyster beds, and a draft biological assessment for section 7 consultation.  (D.E. 61-1, Pages 2-3).  As a result of the revocation, TXGLO notified LACM that it was in default on its lease.  (D.E. 122, Page 148 Line 9-Page 149 Line 21).  In the meantime, LACM continues to operate.

## IV.   ANALYSIS

### A.   Mootness

"Mootness is the doctrine of standing in a time frame."  *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008) (citations omitted).  "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents."  *Id*. at 525 (citing *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004)).  Therefore, before considering any other matters raised by the parties, the Court is obliged to resolve the standing question as a threshold matter of jurisdiction.  *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007).

As a general rule, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot."  *Ctr. for Individual*

*Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). A case should not be declared moot "[a]s long as the parties maintain a concrete interest in the outcome and effective relief is available to remedy the effect of the violation." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998). A case will become moot when "there are no longer adverse parties with sufficient legal interests to maintain the litigation" or "the parties lack a legally cognizable interest in the outcome." *In re Scruggs*, 392 F.3d at 128. "[I]t is not enough that a dispute was very much alive when the suit was filed . . . [t]he parties must continue to have a personal stake in the outcome of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990) (citations omitted) (internal quotation marks omitted).

"A suit may be dismissed because the defendant complies with the Act subsequent to the complaint if the defendant's compliance moots the action." *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1065 (5th Cir. 1991) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987)). "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982); *Cnty. Of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of the power to hear and determine the case."). However, properly acquired jurisdiction may end if (1) subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Davis*, 440

U.S. at 631; *Carr*, 931 F.2d at 1065 (citations omitted) (In order to prove mootness, the defendant must produce evidence "from which it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."). The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting the mootness. *Friends of the Earth*, 528 U.S. at 190. "Defendant-induced mootness is viewed with caution because 'there exists some cognizable danger of recurrent violation' where 'a defendant follows one adjudicated violation with others.'" *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Further, the Fifth Circuit has stated "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009). "[G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Id*. "Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing." *Id*. Even when no formally announced changes to policy exist but plaintiffs have received all they could ask for, no continued controversy exists. *Fontenot*, 777 F.3d at 748. However, other courts have expressed reluctance to permit agencies to

avoid judicial review simply by withdrawing the challenged action.  *See Dow Chem. Co. v. E.P.A.*, 605 F.2d 673, 678 (3d Cir. 1979); *Nadar v. Volpe*, 475 F.2d 916, 917 (D.C. Cir. 1973) ("Where a court is asked to adjudicate the legality of an agency order, it is not compelled to dismiss the case as moot whenever the order expires or is withdrawn. Consideration of important legal issues ought not to be, as they might be, defeated by short term orders, capable of repetition yet evading review.")

Here, it is undisputed that USACE revoked LACM's letter of permission on September 12, 2016.  (D.E. 61-1).   Plaintiff brought this action against Federal Defendants seeking declaratory relief and injunctive relief to prevent USACE from allowing LACM to use unpermitted mooring dolphins.  Federal Defendants argue this relief has already been provided to Plaintiff in the form of USACE's revocation of the letter of permission.  USACE maintains it based its letter of permission on the size and potential impacts of temporary mooring structures but the administrative record reveals USACE had knowledge of LACM's two story headquarters and acquisition of tug boats. (AR 340-351, 383, 384).   Additionally, LACM's submitted removal plan devoted only two paragraphs to addressing methods of removal and provided no proposal for restoration.  (D.E. 94-2, Pages 6-7).   Conversely, the remainder of the removal plan argues in favor of allowing the facility to remain in place or to re-locate and continue operating.  (D.E. 94-2, Pages 7-12).   At the hearing on November 15, 2016, USACE admitted it was considering whether to allow the facility to remain and continue operations.  The Court finds this evidence demonstrates there is a reasonable expectation USACE will continue its conduct which forms the basis of the present action.  Further,

even if the Court cannot provide a fully satisfactory remedy for Plaintiff's harms, the Court still has the power to effectuate a partial remedy and that is sufficient to prevent this case from being moot. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992).

At the time of the hearing on the preliminary injunction, LACM's operation was ongoing. An agency cannot hide behind the mootness doctrine simply because the project is presently operating. *See Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 591 n. 1 (9th Cir. 1981) ("If the fact that [projects] are built and operating were enough to make [a] case nonjusticiable . . . then [agencies] could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine."); *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) ("The difficulty of stopping a bureaucratic steam roller, once started, still seems to us . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction."); *Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F.Supp.2d 1213, 1221 (D. Col. 2007) ("All of the activities Defendants propose to undertake while this action is pending are based on and in furtherance of the decision that is being challenged"). Further, USACE stated it had no authority to stop the continued operation of LACM's facility even though permission was withdrawn. (D.E. 122, Page 8 Line 14-Page 10 Line 19). Accordingly, the Court finds the claims against Federal Defendants are not moot at this time. This ruling does not foreclose Federal Defendants from re-asserting the argument should the circumstances involving the review of the proposed removal and restoration plan change.

### B.     Preliminary Injunction

Plaintiff seeks a preliminary injunction to restrain LACM from "its ongoing unpermitted use of the unauthorized mooring dolphins that it has constructed in the Lydia Ann Channel and its continued unauthorized and unpermitted operation of an industrial barge fleeting facility, fuel sales, and related commercial activities in Lydia Ann Channel while this suit is pending." (D.E. 64, Page 69).  Federal Defendants took no position on Plaintiff's request for a preliminary injunction.  (D.E. 69, Page 3).  LACM argues an injunction is meant to preserve the status quo that existed at the time the lawsuit is filed and if an injunction is granted in the present case, it would disrupt the status quo and cause them financial harm.  (D.E. 104, Page 16).  Additionally, LACM argues the request for injunction is overbroad because it does not specify which actions threaten endangered species and that LACM is already enacting measures that exceed the injunctive relief sought.  (D.E. 104, Pages 16-17).

A preliminary injunction is an extraordinary right.  *Munaf v. Green*, 553 U.S. 674, 689-90 (2008).  The courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987).  In order to be entitled to an award of preliminary injunctive relief, the moving party must establish: (1) it has a substantial likelihood of prevailing on the merits, (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law, (3) the threatened injury outweighs the threatened harm to the defendant, and (4) an injunction

will not disserve the public interest.  *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

### 1.      Substantial Likelihood of Prevailing on the Merits

Plaintiff asserts there is a substantial likelihood it will prevail on the merits because the issuance of the letter of permission violated numerous federal acts.  (D.E. 64, Page 70).  Plaintiff asserts the revocation letter indicates LACM did not have any ESA authorization for its current operations since USACE orders LACM to provide "previously requested threatened and endangered species surveys."  (D.E. 64, Page 71).  There is no evidence the surveys were provided.  Further, Plaintiff maintains LACM's conduct demonstrates an intention to continue operating its facility despite the revocation of its letter of permission and the instructions of USACE to remove the structures.  (D.E. 64, Page 71).  LACM argues Plaintiff has presented no evidence that any protected species have been harmed or had their habitat compromised by LACM's operations.  (D.E. 104, Page 12).  Based upon this assertion, LACM argues Plaintiff cannot make a showing of substantial likelihood of success on the merits.  (D.E. 104, Page 12).

Section 9 of the ESA prohibits "takes" of all listed endangered and threatened species.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.21, 17.31.  "The term take means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The term "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  The term "harass" means "an intentional or negligent act

or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.  Congress intended to define "take" in the "broadest possible manner to include every conceivable way" in which any person could harm or kill wildlife.  S.Rep. No. 307, 93rd Cong., 1st Sess. 1, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 2995.  Section 9 prohibits indirect as well as deliberate takes of endangered or threatened species.  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 700 (1995).

The ESA provides: any person may commence a civil suit on his own behalf "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540.  "The court's power to order injunctive relief depends, as in all other cases, on whether plaintiffs have established by a preponderance of the evidence, that there is 'a reasonably certain threat of imminent harm to a protected species.'"  *Aransas Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000)).  "An injunction may thus be issued only if future injury is 'certainly impending.'"  *Id*. at 664 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Here, Plaintiff's expert, Dr. Gary Mowad ("Dr. Mowad"), testified there was a high probability of a direct take of the endangered Green Sea Turtle and Kemp's Ridley

Sea Turtle as a result of the operation of the facility.  (D.E. 122, Page 130 Lines 6-10). Dr. Mowad stated when the water temperature drops to near forty degrees Fahrenheit, Green Sea Turtles and Kemp's Ridley Sea Turtles in and around the Lydia Ann Channel experience what is known as "cold stunning."  (Intervenor's Ex. 2, Pages 3-4).  These "cold stunning" events are known to impact large numbers of turtles and make them unable to react to barge traffic in and around their habitat.  (Intervenor's Ex. 2, Pages 3-4).  While Dr. Mowad admitted he did not have enough information available to make a determination for the other species listed in the complaint, he had enough information to opine a direct take of these two species was likely to occur due to a "cold stunning" event.  (D.E. 122, Page 130 Line 15-Page 131 Line 3).  The threatened harm resulting from cold-stunning will occur whenever the water temperature drops to the corresponding threshold.  Further, USACE has identified a timeline for its review of the proposed removal and restoration plan which could span multiple winters.  (D.E. 103, Page 7).  Therefore, the Court finds the threat of harm posed by cold stunning events remains imminent.

Additionally, Dr. Mowad opined the algae that will grow on the mooring structures will attract Green Sea Turtles, who feed on the algae, to a location where they will not be able to dive deep enough to evade barge traffic.  (Intervenor's Ex. 2, Page 3). This harm posed to Green Sea Turtles is constant and ever present.  Further, the Court finds LACM's expert, Dr. Carothers, was not credible because his experience does not relate to the impact of barges on cold-stunned turtles.  Dr. Carothers has not studied sea turtles and his experience is limited to the construction of a bridge over a sea turtle

habitat.  (D.E. 122, Page 204 Line 22-Page 210 Line 17).   Accordingly, Plaintiff has established by a preponderance of the evidence that there is a reasonably certain threat of imminent harm.  Therefore, the Court finds Plaintiff has shown a substantial likelihood of success on the merits as to its section 9 claims against LACM.

## 2.    Irreparable Harm

Plaintiff argues the federally listed species and the seagrass beds are being harmed, harassed and destroyed by the toxic, explosive, and otherwise hazardous chemicals now being brought in and stored in the Lydia Ann Channel as well as numerous boats and barges churning the water.  (D.E. 64, Pages 69-70).  LACM argues Plaintiff can only make suggestions and conjectures that some endangered or threatened species are affected by LACM's operations and Plaintiff cannot identify any actual "take" or injury to habitat over the two years the facility has been operating.  (D.E. 104, Page 9). Further, LACM maintains that the risk to the two species of turtles mentioned in Dr. Mowad's report is mitigable.  (D.E. 104, Page 10).

"In general, a harm is irreparable where there is no adequate remedy at law." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981)).   To be considered irreparable, the injury must be permanent or of long duration.  *Amoco*, 480 U.S. at 545. The party seeking a preliminary injunction must show the threatened harm is more than mere speculation.  *Janvey*, 647 F.3d at 601 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); s*ee also W.T. Grant Co.*, 345 U.S. at 633. "[T]he irreparable harm element must be satisfied by independent proof, or no injunction

may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).

### a.    Harm to Endangered Species

As stated in section IV-B-1, Dr. Mowad testified there was a high probability of a direct take of the endangered Green Sea Turtle and Kemp's Ridley Sea Turtle as a result of the operation of the facility during cold stunning events.  (D.E. 122, Page 130 Line 6- Page 131 Line 3).  Dr. Mowad also opined that algae growing on the mooring dolphins would attract Green Sea Turtles to an area where they would not be able to escape the barge traffic leading to a take.  (Intervenor's Ex. 2, Page 3).  This risk of take events poses irreparable harm for the purpose of granting a preliminary injunction.

### b.    Bureaucratic Steam Roller Effect

Additionally, the Court finds it appropriate to assess the risk of not being able to stop the momentum of bureaucratic action when addressing irreparable harm on this motion for preliminary injunction.  *See Marsh*, 872 F.2d at 504.  First, LACM built mooring dolphins that did not conform to the approved specifications contained in its now revoked letter of permission.  The letter of permission authorized twenty-four (24) inch steel pipe and LACM built the structures using thirty-two (32) inch steel pipe.  (AR 94 and 98).  Additionally, some of the pilings were up to seventeen (17) meters off from their proposed locations.  (D.E. 32-1, Page 2).

Second, the facility was larger in scope than USACE believed.  LACM represented its purpose was the temporary mooring of barges to prevent damage to the shoreline.  In reality, LACM intended to and continues to operate a full-service fleeting

facility which includes a fuel barge, grocery service, and crew pick-up and drop-off services.  At one point in time, the facility included a two-story crew headquarters complete with bathrooms, bedrooms, kitchen, and laundry.  (D.E. 122, Page 145 Lines 11-15).  After this structure was removed, a permanent platform structure took its place which contained trash dumpsters, potable water tanks, a picnic area, porta-potties, exercise equipment, washing machines, and other various equipment.  (D.E. 122, Page 145 Lines 16-19).

Further, USACE authorized the letter of permission on the basis that the project would moor no more than four barges at a time.  (AR 100).  When the facility first opened, it was mooring over two-hundred (200) barges per month.  (D.E. 122, Page 230 Lines 17-20).  At the peak of its activity, the facility moored sixty (60) barges in one day.  (D.E. 122, Page 250 Lines 4-5).  The current average number of barges moored at the facility is between sixty (60) and seventy (70) per month.  (D.E. 122, Page 250 Lines 13-14).  On the day before the hearing, eight (8) barges were moored at the facility.  (D.E. 122, Page 266 Lines 24-25).  On average, a barge stays at the facility for three days.  (D.E. 122, Page 235 Lines 1-3).  However, the longest time a barge stayed at the facility was between ten and twelve days.  (D.E. 122, Page 265 Lines 5-6).

Thirdly, USACE claims to have no authority to enforce its instructions that LACM remove the mooring structures.  The letter of permission was revoked by USACE on September 12, 2016.  (D.E. 61-1).  Based on the revocation, the Texas General Land Office has informed LACM it is in default on its lease.  (D.E. 122, Page 25 Line 11-Page 36 Line 2).  However, USACE indicated it cannot order LACM to stop using the

unauthorized mooring dolphins until its review of the proposed removal and restoration plan is complete.  The Court finds allowing the facility to continue operation during the review process would result in the increased difficulty of stopping the operation at a later time.  *See Colo. Wild*, 523 F.Supp.2d at 1221 (citing *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (finding irreparable injury based on the "difficulty of stopping a bureaucratic steam roller, once started.")).

Finally, LACM devoted all but two paragraphs of its proposed removal and restoration plan to convincing USACE to allow the moorings to stay in place as presently used or relocate to a nearby area.  USACE represented it is considering the possibility of allowing the moorings to stay in place.  Despite the revocation of the letter of permission and the resulting default on the lease, the momentum of LACM's fleeting facility has become difficult to stop.  Therefore, the Court finds Plaintiff has satisfied its burden of showing irreparable harm based on the impact on the two endangered sea turtle species in the area and the bureaucratic steam roller effect of allowing the facility to continue operating pending USACE review.

### 3.    Balancing of the Equities

The third element required for a preliminary injunction is the balancing of equities.  *See DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996).  According to Plaintiff, the injunction would enforce USACE's instructions to remove the unpermitted structures and to restore the area.  (D.E. 64, Page 71).  Plaintiff claims, that unless LACM is enjoined from operating its barge facility, it will suffer harm attributable to LACM's operation including abuse of the natural environment,

interference with and displacement of recreational opportunities, impairment and destruction of cultural resources, and illegal "take" of federally-listed species in the Lydia Ann Channel.   (D.E. 64, Page 72).   LACM asserts its facility protects wildlife by avoiding potential hazards involved with barges pushing up against shorelines including damage to shallow water areas along the shoreline.   (D.E. 104, Pages 13-14).   LACM maintains no actual environmental harms have resulted from its facility.   (D.E. 104, Pages 13-14).

The Court evaluates the severity of the impact on Defendants if the injunction is granted and the hardship that would occur to Plaintiff if the injunction is denied.   *See DSC Commc'ns*, 81 F.3d at 600.   In the context of the ESA, when courts weigh the threatened injury from granting the injunction against the threatened injury from denying the injunction, the balance of equities will lean more heavily in favor of protecting wildlife than it would in the absence of the ESA.   *Amoco*, 480 U.S. at 545.

Here, the balancing of the equities favors granting the preliminary injunction. Granting the preliminary injunction will force LACM to stop operating its fleeting facility until USACE completes its review process for the removal and restoration of the area.   Alternatively, not granting the injunction would mean the facility would continue operating, threatening the take of Kemp's Ridley and Green Sea Turtles in the Lydia Ann Channel.   The protection of endangered and threatened species is considered the highest of priorities.   *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost").   Additionally, allowing the facility to operate during

USACE's review process would increase the difficulty of removing the operation should USACE determine that is the correct course of action.  Further, LACM would only suffer economic harm if the injunction is granted.  Considering how the balance of equities leans more heavily in favor of protecting wildlife, the Court finds the potential impact on the two species of sea turtles identified above and the bureaucratic steam roller considerations favor granting the injunction.  *See Amoco*, 480 U.S. at 545.

### 4.    Public Interest

The final factor a court considers is whether a preliminary injunction is in the public interest.  *Clark*, 812 F.2d at 993.  Plaintiff asserts the public interest dictates the granting of its request for a preliminary injunction.  (D.E. 64, Page 72).  Plaintiff states granting the preliminary injunction would further the public policy behind USACE's revocation of the letter of permission and restore the Lydia Ann Channel.  (D.E. 64, Page 72).  LACM argues more environmental harm will occur if it is enjoined from operating and an injunction which would cause environmental damage cannot be in the public interest.  (D.E. 104, Page 15).

Here, the public interest weighs in favor of granting the preliminary injunction.  As discussed in section IV-B-2-b, LACM constructed mooring dolphins that did not comply with the letter of permission and USACE concluded LACM's stated purpose and need for the project did not accurately describe the scope of the operation.  (D.E. 61-1, Page 2).  Accordingly, the letter of permission was revoked.  (D.E. 61-1).   As a result of the revocation of the letter of permission, LACM's lease is now in default.  (D.E. 122, Page 35 Line 11-Page 36 Line 2).  Despite the revocation of the letter of permission,

USACE maintains it has no authority to stop LACM from using the non-permitted mooring dolphins to operate its facility until after USACE completes its review of the proposed removal and restoration plan. The public interest dictates when non-conforming projects or projects that simply ignore regulatory requirements are built, the parties responsible for such structures must not be able to hide behind those same regulatory requirements to escape consequences. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 44 (D.C. Cir. 2015). Accordingly, the Court finds the public interest would be best served by granting the preliminary injunction.

### 5.    Preliminary Injunction Should Be Granted

As described above, the Court finds all four requirements for a preliminary injunction have been met. A facility must not be allowed to operate in an environmentally sensitive area if its lease to function there is in default and its permission to use the structures has been revoked. Despite USACE's revocation of the letter of permission, USACE maintains it cannot enforce its instructions to remove the structures. In sum, LACM is operating a large scale, unpermitted fleeting operation in an environmentally sensitive area with its lease in default. It is unacceptable that LACM can continue operating under these circumstances without any sort of consequences. Accordingly, LACM must cease conducting operations in the Lydia Ann Channel from the date of entry of this order until further order of the Court.

### C.    Staying the Litigation

The power to stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for

counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Petrus v. Bowen*, 833 F.2d 581 (5th Cir. 1987). Other district courts have recognized the ability of the Court to stay proceedings under the ESA in the interest of gathering further evidence which would help the Court make its ultimate determination. *See Strahan v. Pritchard*, 473 F.Supp.2d 230 (D. Mass. 2007) (finding appropriate response to alleged entanglement of endangered whale in lobster fishing gear was to stay the action for two years for the parties to monitor whale entanglements and other advances in technologies and procedures); *Common Sense Salmon Recovery v. Evans*, 329 F.Supp.2d 96 (D.D.C. 2004) (District court stayed ESA challenge to list species as threatened or endangered until NMFS made final listing decisions where there was no allegation of immediate harm); *see also La. Crawfish Producers Ass'n West v. Mallard Basin, Inc.*, 2012 WL 4753389 (W.D. La. 2012) (affirming stay of action by magistrate judge until USACE review of permit process was completed).

The Court finds a stay will allow USACE to finish its review process regarding the proposed removal and restoration of the Lydia Ann Channel. Staying the litigation until the completion of USACE's review will allow the Court and all parties to focus on the remaining issues in dispute and reach the appropriate resolution. Accordingly, all pending motions will be stayed pursuant to this Order. Further, the Court orders that the parties shall file a status report 90 days after entry of this Order and every 60 days thereafter until USACE makes its final determination. Once USACE has made its final determination, the Court will decide how to proceed with the case.

V.    **CONCLUSION**

For the reasons stated above, Plaintiff's request for a preliminary injunction is **GRANTED**. LACM and its agents, servants, representatives, employees, and all those acting in aid of and in concert with are immediately enjoined and restrained from conducting any operations in the Lydia Ann Channel from the date of entry of this order until further order of the Court. It is further **ORDERED**, that following entry of this Order, Case No. 2:15-cv-514 be **STAYED**, together with all pending motions, until USACE's review is completed or the Court orders otherwise. It is further **ORDERED** that the parties shall file a status report with the Court ninety (90) days from the date of this Order and every sixty (60) days thereafter until USACE's review is completed.

SIGNED and ORDERED this 13th day of March, 2017.

Janis Graham Jack
Senior United States District Judge